[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-12624
Non-Argument Calendar
_____

D.C. Docket No. 5:11-cr-00031-RS-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DENNIS CALVIN BUSH, JR.,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(August 27, 2013)

Before CARNES, Chief Judge, HULL and FAY, Circuit Judges.

PER CURIAM:

After a jury trial, Dennis Bush appeals his convictions for (1) conspiring to

possess with intent to distribute cocaine; (2) possessing with intent to distribute

cocaine; (3) possessing a firearm in furtherance of a drug trafficking crime; and (4) being a felon in possession of a firearm.  Bush argues the district court erred (1) in denying his motion to suppress evidence seized from a codefendant's residence pursuant to a search warrant, and (2) in giving an Allen[1] charge to the jury.  After review, we affirm.

## I.  SEARCH WARRANT AFFIDAVIT IN MAY 2011

In May 2011, Investigator Ray Scott of the Bay County Sheriff's Office applied for a warrant to search the home of Bush's codefendant, Kendra Stadmire, located at 2904 Cocoa Court, Panama City, Florida ("2904 Cocoa Court").  Investigator Scott's affidavit contained the following information.

In May 2010, local law enforcement officers commenced a lengthy investigation into the activities of Daniel Marlow, a known drug dealer.  Nearly a year later, on April 14, 2011, Investigator Scott observed a blue Chevrolet truck travel between Marlow's residence and 2904 Cocoa Court.  Scott learned that Stadmire was renting the truck.  Stadmire had a "history and pattern of renting vehicles for short and long terms" and putting mileage on those rental vehicles consistent with trips to "source cities" such as Ft. Lauderdale and Miami, Florida,

---

[1] Allen v. United States, 164 U.S. 492, 17 S. Ct. 154 (1896).  The Allen charge "instructs a deadlocked jury to undertake further efforts to reach a verdict." United States v. Chigbo, 38 F.3d 543, 544 n.1 (11th Cir. 1994).

and Atlanta, Georgia.  In Scott's experience, it was common for drug traffickers to use those "source cities" to obtain narcotics.

Defendant Bush was listed as the second driver of the Chevrolet rental truck, and 2904 Cocoa Court was listed as Bush's address on the rental forms.  A background check revealed that Bush had an "extensive history" of drug-related offenses.

Investigator Scott began conducting surveillance on 2904 Cocoa Court and observed a second Chevrolet truck there, similar to the one rented by Stadmire.  He also observed a car parked in a nearby vacant lot.  That car was registered to Quanda Henry, who had a history of "narcotic violations."

On April 15, 2011, Sergeant Chad King, who was also conducting surveillance, observed a small Ford car enter the driveway of 2904 Cocoa Court.  An unknown black female exited the house and approached the car, and the car's occupant handed money to the black female.  Sergeant King believed this to be a narcotics transaction, based on his training and experience.  The Ford car remained at 2904 Cocoa Court for three to four minutes, which Investigator Scott described as a "short stay[]" consistent with the purchase of drugs.

In the early morning hours of April 16, 2011, pursuant to Investigator Scott's request, a K-9 Deputy had his dog conduct a "free air" sniff of the front door of 2904 Cocoa Court, and the dog gave a positive alert for the presence of

3

narcotics.  Although the location of the sniff was open to public access and was not restricted by a fence or "no trespassing" signs, Scott noted in the affidavit that the sniff could be "subject to a challenge based on recent case law."

At approximately 10:20 a.m. that same day, Investigator Scott saw defendant Bush and Stadmire arrive at 2904 Cocoa Court in the Chevrolet rental truck and enter the house.  From 10:50 a.m. through 12:55 p.m., Investigator Scott saw four cars arrive at 2904 Cocoa Court.  These cars stayed for approximately 10, 15, 85, and 90 minutes, respectively.  One car was registered to a woman who had possible connections to a cocaine trafficker.  Another car was registered to a man who had an "extensive history" of narcotics violations and was on felony probation for trafficking cocaine.  Investigator Scott also saw Quanda Henry, who had a history of narcotics-related offenses, exit 2904 Cocoa Court and enter her car, which was parked in the vacant lot.

Throughout the next day, April 17, 2011, Investigator Scott observed six cars drop by 2904 Cocoa Court.  The cars stayed for approximately 10, 3, 150, 30, 1, and 3 minutes, respectively.  One of these six visitors was Marlow, the known drug dealer who sparked the investigation in the first place.  Marlow stayed at 2904 Cocoa Court for approximately two and a half hours.

4

On April 23, 2011, Investigator Scott learned that Stadmire had rented another blue truck, a Ford F-150 ("the Ford rental truck"), which he observed at 2904 Cocoa Court.

At 4:15 a.m. on April 27, 2011, through "visual surveillance," Investigator Scott observed the Ford rental truck leave 2904 Cocoa Court and travel to Cordele, Georgia, stopping at what Scott believed was a Ramada Inn. The local officers in Cordele informed Investigator Scott that they previously had made narcotics-related arrests at that Ramada Inn. The Ford rental truck stayed at the Ramada Inn for a short period of time and then returned to Bay County.

On April 29, 2011, Investigator Scott observed a car arrive at 2904 Cocoa Court. A man exited the passenger side of the car, entered the house for a short period of time, and then departed. The car was registered to a woman with a history of narcotics-related arrests, and was driven by another woman with a past history of narcotics-related arrests.

On May 2, 2011, Investigator Scott observed a red Crown Victoria arrive and spend the night at 2904 Cocoa Court. Early in the morning the next day, an unknown black female entered the front passenger side of the Crown Victoria. She exited the car holding a clear plastic baggie containing what Investigator Scott believed to be powder cocaine taken from a "brick."

5

On May 4, 2011, the Ford rental truck left 2904 Cocoa Court at 4:15 a.m. and traveled to Tifton, Georgia, stopping at a Ramada Inn. Tifton was a "source city" for cocaine and prescription medications. Stadmire and defendant Bush returned to 2904 Cocoa Court in the Ford rental truck on the same day, carrying what appeared to be an overnight bag. In his affidavit, Investigator Scott stated that individuals trafficking in drugs will make "turn and burn" trips to pick up narcotics and then return home.

On May 5, 2011, Investigator Scott saw that a blue trash receptacle had been placed in front of 2904 Cocoa Court for disposal or pickup. The next day, Scott noticed the same blue trash receptacle in front of the residence. Previously, throughout the surveillance period, Stadmire and Bush usually put out the trash just minutes before the arrival of the garbage truck, which Investigator Scott stated was common for persons engaged in the use and sale of controlled substances.

On May 6, 2011, investigators retrieved two securely-tied trash bags from the trash receptacle in front of 2904 Cocoa Court. One trash bag contained (1) approximately eight small jewelry bags, four of which tested positive for cocaine, and (2) documentation with Stadmire's name and the 2904 Cocoa Court address. The second trash bag contained marijuana, marijuana seeds and stems, and two paper towels holding marijuana. The paper towels also tested positive for cocaine.

6

Based on the above information in the affidavit, Investigator Scott sought and obtained a search warrant for 2904 Cocoa Court.

## II.  EVIDENCE DISCOVERED DURING THE SEARCH

As shown at Bush's trial, during the search of 2904 Cocoa Court, officers found firearms and extensive evidence of drug activity.  Specifically, upon entering the house, investigators found defendant Bush inside a locked bathroom and discovered on his person $1,000 in cash and 2 plastic baggies containing suspected cocaine and marijuana.  Also inside the bathroom, investigators found 2 bags of cocaine in the toilet, an Ajax can with a hidden storage compartment, mason jars with labels that corresponded to brands of marijuana, around 50 jeweler's bags of cocaine, multiple unused jeweler's bags with either a clover or a Superman emblem on them, sandwich bags, 2 digital scales, a cutting agent, straws used to snort cocaine, a cell phone, and an unopened set of measuring cups and spoons.

In the bedroom, officers found a loaded .45 caliber semi-automatic pistol and a loaded .40 caliber pistol.  They also found more U.S. currency, jeweler's bags of cocaine, a digital scale, new whisks in their packaging, and measuring cups.  In the kitchen, an investigator found measuring cups that tested positive for cocaine residue, and a metal cup and two open boxes of baking soda, items that are commonly used in manufacturing crack cocaine.  The kitchen counter also tested

7

positive for cocaine.  As stipulated by the parties, investigators seized a total of 34.1 grams of cocaine from the house.

## III.  INDICTMENT

Following the search, Bush and Stadmire were indicted for (1) conspiracy to possess with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846 ("Count 1"); and (2) possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 2 ("Count 2").  The indictment also charged defendant Bush with (3) possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i) ("Count 3"); and (4) possession of a firearm while being a convicted felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2) ("Count 4").

## IV.  MOTION TO SUPPRESS

### A.    GPS Tracking Device

Before trial, the government sent a letter to Bush's attorneys, informing them that, during the investigation, "a tracking device" was placed on the Ford rental truck on April 27 until May 10, 2011.  The letter explained:

> The tracking device was placed on the vehicle on April 27, 2011, in the early morning hours, when the vehicle was parked in the driveway of 2904 Cocoa Court.  The tracking device was placed on [the] exterior of the truck, was self-contained, and did not use any power source from the vehicle.  The tracking device was used for informational purposes only.  It was removed from the vehicle on May 10, 2011.

8

Upon learning of the tracking device, Bush moved to suppress the evidence seized from 2904 Cocoa Court during the execution of the search warrant.

Bush's motion argued that the warrantless placement and monitoring of a tracking device on the truck was a search and seizure, violative of his Fourth Amendment rights, and that the information learned from the tracking device was improperly used to obtain the search warrant. Bush relied on United States v. Jones, 565 U.S. ___, 132 S. Ct. 945 (2012), in which the Supreme Court held that attaching a Global Positioning System ("GPS") tracking device to a vehicle constituted a search under the Fourth Amendment. Id. at __, 132 S. Ct at 949. Bush's motion argued that (1) without the information learned from the tracking device, the search warrant would not have been granted, and (2) the good-faith exception to the exclusionary rule did not apply.

## B.    Suppression Hearing

The district court held a suppression hearing, at which the government presented several witnesses. Investigator Scott testified that, on April 16, 2011, after conducting surveillance on 2904 Cocoa Court for two days, he ordered a dog sniff of the front door of the residence. At the time, he believed that a dog sniff of the front door was legal as long as there were no gates or signs saying "No Trespassing." After the dog alerted to the presence of narcotic odors, Scott attempted to obtain a search warrant, but then learned that the law had changed and

9

required a warrant to conduct a dog sniff.  Therefore, Scott did not obtain the search warrant for the house, but instead continued surveillance.  Scott observed cars and individuals appearing at 2904 Cocoa Court, staying for short periods of time, and then leaving.  This activity, he testified, was consistent with narcotics-related sales.  A short stay meant a visit of 10 to 15 minutes.

Investigator Scott further testified that, on April 27, 2011, Sergeant King attached a magnetic GPS tracker under the blue Ford rental truck.  At that time, in 2011, investigators believed that (1) they could enter the driveway if it was not enclosed and no signs saying "no trespassing" were posted, and (2) they did not need a search warrant to use the GPS tracker.

Investigator Scott explained that the GPS tracker would inform the officers when the vehicle started moving, and would relay the speed and location of the vehicle every four seconds.  Using the GPS tracker, Scott learned that the Ford rental truck traveled to Cordele and Tifton.  He knew from past arrests that Tifton and Cordele were meeting places for drug purchases.

Investigator Scott did not conduct a trash pull until May 6, 2011, because, although he and other officers had attempted to do so "many times," Stadmire and Bush always waited until the morning of the trash pick-up to put out the trash.  On May 5, 2011, the investigators observed the trash placed by the side of the road,

10

but did not want to conduct a trash pull during the daylight hours.  Thus, they conducted the trash pull early in the morning on May 6, 2011.

On cross examination, Investigator Scott denied that he conducted the trash pull because of Stadmire and Bush's May 4 trip to Tifton.  Rather, Scott explained, he conducted the trash pull due to "not only the dog sniff, but the fact that this [was] the first time [Stadmire and Bush] had set the garbage out where we were able to get it."  Scott believed that the trash pull, the number of short stays, and the histories of the people visiting the house gave rise to probable cause to search the house, even without considering the dog sniff and the GPS tracking.

Sergeant King testified that he attached the magnetic GPS device underneath the rear of the truck while it was in the driveway of 2904 Cocoa Court.  At the time that he attached the GPS tracker, Sergeant King believed that he did not need a warrant to do so, and that he could enter a property to install a GPS tracker as long as there were no boundaries preventing a "normal citizen" from approaching the area.

## C.    District Court's Order on Suppression

The district court denied Bush's motion to suppress, finding that the investigators relied in good faith upon existing Eleventh Circuit precedent when they placed the GPS tracker on the truck.  See United States v. Michael, 645 F.2d 252, 257-58 (5th Cir. May 11, 1981) (en banc) (allowing a warrantless attachment

11

of a "beeper" tracking device to the exterior of a vehicle parked in a public place, where investigators had a reasonable suspicion to believe the user of the vehicle was involved in criminal activity).[2]

The district court also determined that the driveway was not the curtilage of the house and the investigators' entry into the driveway was lawful. The district court further found that, although the dog sniff alone could not provide probable cause, Investigator Scott properly included the sniff in his search warrant affidavit.

In the alternative, the district court found that, even if the challenged evidence were suppressed, Scott's affidavit provided probable cause sufficient to obtain a search warrant because it included information about the trash pull, the short stays, and the narcotics-related histories of individuals visiting the house.

We analyze the suppression issues before discussing the Allen issue.

## V. ANALYSIS OF SUPPRESSION ISSUES

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.[3] In this case, we need not

---

[2]This Court has adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

[3]We review a district court's denial of a motion to suppress as a mixed question of law and fact, reviewing factual findings for clear error and the application of the law to the facts de novo. United States v. Bautista-Silva, 567 F.3d 1266, 1271 (11th Cir. 2009). We construe the facts in the light most favorable to the prevailing party in the district court. Id. Similarly, we

decide whether the attachment of a GPS tracking device to the Ford rental truck, or the dog sniff at the front door of Stadmire's residence, violated the Fourth Amendment.  This is because, even if a Fourth Amendment violation occurred, the independent source doctrine allowed the admission of the evidence found during the search of 2904 Cocoa Court.  See United States v. Noriega, 676 F.3d 1252, 1260-61 (11th Cir. 2012).[4]

The independent source doctrine involves a two-step process.  Noriega, 676 F.3d at 1260.  First, we "excise from the search warrant affidavit any information gained during the arguably illegal initial [search] and determine whether the remaining information is enough to support a probable cause finding."  Id. Second, if the remaining information establishes probable cause, we determine "whether the officer's decision to seek the warrant was prompted by what he had seen during the arguably illegal [search]."  Id. (internal quotation marks omitted). If the officer would have sought the warrant even without the preceding illegal search, the evidence seized under the warrant is admissible.  Id. at 1261.

---

review de novo whether a search warrant affidavit established probable cause, but review the "findings of historical fact only for clear error and . . . give due weight to inferences drawn from those facts by resident judges and local law enforcement officers."  United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (internal quotation marks omitted).

[4]For this reason, we also need not decide whether the good-faith exception to the exclusionary rule applied; that is, whether law enforcement officers attached the GPS device in good-faith reliance on our then-binding precedent in Michael, 645 F.2d at 257-58.

13

Here, if we excise from Scott's affidavit all the information derived from the GPS tracking device, his affidavit still contains enough incriminating material to support a finding of probable cause for a search of 2904 Cocoa Court. Specifically, his affidavit reveals that (1) Stadmire's rental cars showed mileages consistent with trips to "source cities"; (2) Bush was listed as a second driver on the Chevrolet rental truck and had an extensive history of drug offenses; (3) one investigator witnessed what he believed to be a drug transaction in the driveway of 2904 Cocoa Court; (4) people with histories of narcotics offenses visited the house often; (5) cars would stop at the house for "short stays," consistent with drug transactions; (6) one of the visitors to the residence was a known drug dealer; (7) an investigator saw a woman in the driveway carrying a baggie of what appeared to be cocaine; and (8) a trash pull from the residence revealed multiple baggies that tested positive for cocaine, as well as stems and seeds of marijuana. This information suffices to establish probable cause. See Noriega, 676 F.3d at 1261 (stating probable cause exists when the "totality of the circumstances" would lead a "reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime" (internal quotation marks omitted)).

Bush argues that the investigators conducted the trash pull based on information that they learned from the GPS, and, therefore, the district court should have excluded it from the search warrant affidavit as "fruit of the poisonous tree."

14

However, Bush presents nothing but conclusory statements to support that argument. In contrast, Investigator Scott explicitly testified at the suppression hearing that he conducted the trash pull not because of anything he learned from the GPS, but because he had not yet had an opportunity to conduct a trash pull. Because the district court did not clearly err in crediting Scott's testimony, we must accept it as true. See United States v. Bautista-Silva, 567 F.3d 1266, 1271 (11th Cir. 2009).

As to the second step of the independent-source inquiry, nothing in the record suggests that Investigator Scott's decision to seek the search warrant was prompted by the information gleaned from the GPS tracking device, or that he would not have sought the search warrant without this GPS information. The GPS tracking device at most revealed that Stadmire and Bush traveled to Cordele and Tifton, Georgia, places known for drug transactions, and stayed there for only brief periods. Other untainted information in Scott's affidavit, as described above, was certainly more incriminating. As to the dog sniff, Investigator Scott's testimony shows that it did not prompt him to obtain the search warrant, given that he became aware of the dog sniff's potential illegality before seeking the warrant, and even noted this problem in his affidavit.

In sum, pursuant to the independent source exception, the exclusionary rule did not bar admission of the evidence seized from 2904 Cocoa Court, even if the

15

placement of the GPS tracking device and the dog sniff violated the Fourth Amendment. Accordingly, the district court did not err in denying Bush's motion to suppress.

We now discuss the facts surrounding the <u>Allen</u> charge.

## VI. FACTS RELATING TO THE <u>ALLEN</u> CHARGE

### A. Jury Deliberations

After jury selection, the district court explained to the jurors the expected schedule of trial as from approximately 8:30 to 5:00, as follows:

> [W]e will go until 5:00, if that's a reasonable stopping place, unless we have a witness that we can finish up with another five minutes, we'll push it past that. We'll start at 8:30 in the morning. We'll take a midmorning and a midafternoon break for about 15 minutes. We'll stop for lunch tomorrow and take an hour and 15 minutes, and then whether we have to go into Wednesday, we'll just have to see. But we'll stick to that same time schedule.

The trial lasted only two days.

At 2:20 p.m. on the second day, the jury retired to deliberate. At 3:37 p.m., the jury sent a note, stating: "Count 3 on the indictment and Count 3 on our verdict sheet needs clarifying."[5] The district court brought the jury out and asked the foreperson to elaborate on the question. The foreperson responded:

> We're just at a point we're confused. We don't know if it's guilty or not guilty, because if this information on this sheet—on the indictment sheet, if that was put onto our verdict as a question, there

---

[5]Count 3 charged Bush with possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i).

16

would be no problem with it; we could make a decision on it.  But we read one and then we read the other, and it—we're just at a stalemate.

The district court instructed the jury (1) that it should read the verdict form in conjunction with the jury instructions, and (2) that to find Bush guilty of Count 3, it had to find him guilty of either Count 1 or Count 2, or both.  The foreperson then asked for a definition of the word "furtherance."  The district court explained that "furtherance" meant "helped," "promoted," or "advanc[ed] the crime."  The jury retired to continue deliberations at 4:03 p.m.

At 4:55 p.m., the jury sent another question, asking: "Does the law state that the presence of the gun alone involve[s] it in the crime of trafficking, or must it be used in some manner?"  The district court told the jury to look to the jury instructions.

The foreperson then requested that another juror speak directly to the court. That other juror asked whether the firearm's presence in the home "involve[d]" it in the trafficking crime.  The district court responded: "No."  The jury retired to continue deliberations at 5:07 p.m.

At 5:40 p.m., the district court informed the parties that one of the jurors needed to make a phone call related to her "child or something," and that the other jurors would take a break outside.  Bush's attorney asked whether the jury had "indicated anything about dinner."  The district court responded that the jurors had

17

not asked about dinner but that "somebody asked, you know, whether they could go home and come back tomorrow."

Bush's attorney then indicated that she could come back the following day. The district court responded: "let's take it a step at a time, let the one juror deal with her communication thing, let everybody get out of the room, go out there and walk around, and get them back in there and give them a little bit more time.  I don't know what else to do."

## B.    The Allen Charge

At 6:07 p.m., the following exchange occurred between district court and the parties relating to the Allen charge.

> THE COURT:  All right.  Doesn't look like the fresh air has taken effect yet.  And I think it's probably time for an Allen charge . . . .
>
> What has been transmitted to me is . . . the foreman[] first asked Officer Dobos if I could speak with [the juror] who spoke up earlier . . . .  And, I think Officer Dobos told him, "No way."
>
> And then the next plea came from [the foreman], would I talk with him and [the other juror]?  And . . . obviously I'm not going to do that.
>
> Does anybody have any ideas other than—I think we've already told them about the instructions.  About all I think we can do is the Allen charge at this point, and see if they will stick with it a little bit longer, and see where we go from there.
>
> Any ideas?
>
> [THE GOVERNMENT]:  Agreed, Your Honor.

18

. . . .

MS. DOWNING [Bush's attorney]:  . . . Your Honor, I thought the Allen charge was only appropriate when they actually advised the [district court] that they were deadlocked.

THE COURT:  Well, I don't think it's really limited to that.  I think I need to tell them that they have the appropriate guidance in the form of the Eleventh Circuit instruction and that I don't think we can do anything more in terms of parsing that.

And . . . I think as a practical effect, they're not making any progress, they're essentially deadlocked and they're asking to come back tomorrow, and—is that a fair assessment?

MS. DOWNING: I would request that we let them leave and come back tomorrow . . . .  I don't have any case law for it, but it's just always been my understanding that the Allen charge was only given when they said, "We're at a deadlock."  And you know, the [district court] seems to be interpreting what they're saying as being at a deadlock.

THE COURT:  . . . I think they've essentially made that communication clear, Ms. Downing . . . .  It walks like a duck, quacks like a duck, and they've been out how many hours?

MS. DOWNING: About four.

THE COURT:  All right, bring them in.

MS. DOWNING:  I would just request that they be allowed to go home.

THE COURT: No, I'm not—We're going to give them one more try.  And I think once they've started their deliberations like this, in a criminal case, we need to get this over with.

The district court then called the jury into the courtroom and gave them the

Allen charge, as follows:

19

I want to give you another instruction for your consideration in the hopes that it will give you pause for reflection and reassessment, and hopefully some encouragement.

Members of the jury, I am going to ask that you continue your deliberations in an effort to agree on a verdict and dispose of this case.

I have a few additional comments I would like for you to consider as you do so. This is an important case. The trial has been expensive in time, effort, money and emotional strain for both the defense and the prosecution. If you fail to agree on a verdict, the case will be left open and may have to be tried again. Obviously, another trial will—would only increase the cost to both sides, and there is no reason to believe that the case can be tried again by either side any better or more exhaustively than it has been tried before you.

Any future jury must be selected in the same manner and from the same source as you were chosen. There is no reason to believe that the case could ever be submitted to 12 people more conscientious, more impartial or more competent to decide it, or that more or clearer evidence could be produced.

If a substantial majority of you are in favor of a conviction, those of you who disagree should reconsider whether your doubt is a reasonable one, since it appears to make no effective impression upon the minds of the others.

On the other hand, if a majority or even a smaller number of you are in favor of an acquittal, the rest of you should ask yourselves again, and most thoughtfully, whether you should accept the weight and sufficiency of evidence that fails to convince your fellow jurors beyond a reasonable doubt.

Now remember at all times that no juror is expected to give up an honest belief about the weight and effect of the evidence, but only after fully considering the evidence in the case you must agree upon a verdict if you can.

20

You must remember that if the evidence failed to establish guilt beyond a reasonable doubt, the defendant must have your unanimous verdict of not guilty.

You should not be hurried in your deliberations and should take all the time you feel is necessary.

I am going to now ask that you retire once again and continue your deliberations with these additional comments in mind. Apply them in conjunction with all the other instructions that I have previously given you.
        . . . .

If you would, now, with this latest instruction in mind, if you would go and make a further effort.

The jury retired to continue deliberations at 6:21 p.m. Approximately 47 minutes later, at 7:08 p.m., the jury reported that it had reached a verdict of guilty on all counts.

## C.    Motion for a New Trial

After trial, Bush filed a combined motion for a judgment of acquittal and for a new trial, pursuant to Federal Rules of Criminal Procedure 29 and 33. As to a new trial, Bush argued, among other things, that the Allen charge may have coerced the jury into reaching a guilty verdict because (1) the district court had advised the jury that it could leave at 5:00 p.m.; (2) a jury member asked to make a call to resolve a child-care issue; (3) a juror had asked a courtroom security officer if the jury could go home for the night; (4) the jury had been deliberating for four hours; (5) the jury had asked the district court several questions; and (6) the district

21

court had not provided dinner for the jury.  Bush contended that the jury would not have returned a conviction on Count 3— the possession of a firearm in furtherance of drug trafficking—if it had been allowed to deliberate at leisure.

The government responded that the district court properly read the Allen charge.  The government stated that the jury's questions to the district court made clear that the jurors "were split with regards to Count Three and weren't making any progress."

The district court summarily denied Bush's motion for acquittal and a new trial.  Subsequently, the district court sentenced Bush to a total 360-month term of imprisonment, consisting of (1) 300 months as to Counts 1 and 2, and 120 months as to Count 4, all to be served concurrently; and (2) 60 months as to Count 3, to be served consecutively to the sentences for Counts 1, 2, and 4.

## VII.  ANALYSIS OF THE ALLEN CHARGE ISSUE

As an initial matter, Bush does not argue that the language of the given Allen charge was coercive, and any such argument would be unavailing.[6]  The

---

[6]We review a district court's decision to give an Allen charge for abuse of discretion. See United States v. Woodard, 531 F.3d 1352, 1364 (11th Cir. 2008).  "[W]hen employing an abuse-of-discretion standard, we must affirm unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard."  United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc).

Where, as here, the district court did not poll the jury before giving the Allen charge, we may reverse the verdict only if we find that the charge was "inherently coercive."  United States v. Dickerson, 248 F.3d 1036, 1050 (11th Cir. 2001); see also Woodard, 531 F.3d at 1364.

22

<u>Allen</u> charge in this case was derived from the Eleventh Circuit pattern <u>Allen</u> instructions, which we have approved "on numerous occasions."  <u>See</u> <u>United States v. Woodard</u>, 531 F.3d 1352, 1364 (11th Cir. 2008); <u>see also</u> Eleventh Circuit Pattern Jury Instructions (Criminal Cases) 2010 at 639-40.

Rather, Bush argues that the <u>Allen</u> charge was erroneous because (1) the charge was premature, occurring after only four hours of deliberations and before the jury indicated that it was deadlocked, and (2) the charge was inherently coercive, given the totality of the circumstances.  We disagree.

First, the <u>Allen</u> charge was not premature under our precedent simply because it was given only four hours after deliberations began.  <u>See</u> <u>United States v. Alonso</u>, 740 F.2d 862, 877 (11th Cir. 1984) ("The timing of an <u>Allen</u> charge is within the trial court's discretion."); <u>United States v. Scruggs</u>, 583 F.2d 238, 241 (5th Cir. 1978) ("We have never required the trial judge to wait for requests from counsel or from the jury before giving the [<u>Allen</u>] charge.").  In fact, the former Fifth Circuit has held that an <u>Allen</u> charge given only 65 minutes after the start of deliberations was "in no manner erroneous."  <u>Andrews v. United States</u>, 309 F.2d 127, 129 (5th Cir. 1962); <u>see also</u> <u>United States v. Bailey</u>, 468 F.2d 652, 664 (5th Cir. 1972) (stating that giving the <u>Allen</u> charge 3 1/2 hours after the jury retired to

---

In conducting this determination, "we consider [1] the language of the charge and [2] the totality of the circumstances under which it was delivered."  <u>Woodard</u>, 531 F.3d at 1364.

23

deliberate was not an abuse of discretion), aff'd en banc, 480 F.2d 518 (5th Cir. 1973).

Nor was the Allen charge premature just because the jury did not expressly state that it was deadlocked. Our precedent does not require such an express indication of deadlock before the district court gives an Allen charge. Gov't of Canal Zone v. Fears, 528 F.2d 641, 644 (5th Cir. 1976) ("There is no requirement that the jury be deadlocked before [an Allen] charge is given."); see also United States v. Scruggs, 583 F.2d 238, 239, 241 (5th Cir. 1978) (affirming the district court's sua sponte Allen charge where the jury did not indicate that it was deadlocked). And the jury in this case did indicate that it was having difficulty reaching a verdict, at least with respect to Count 3. Specifically, before the Allen charge, (1) the jury deliberated for almost four hours; (2) it sent out two questions about Count 3; (3) it returned to the courtroom for further instructions twice, with the foreperson stating that it was "at a stalemate"; (4) an individual juror questioned the district court about a count; and (5) two jurors requested to speak personally with the district court.

As to the totality of the circumstances, Bush points to several factors allegedly demonstrating the coerciveness of the Allen charge, namely, (1) the district court's advice during jury selection that the jury could leave at 5:00 p.m.; (2) a juror's request to make a call to take care of a child-care issue; (3) a juror's

24

request for the jury to go home for the night; and (4) the district court's failure to provide dinner for the jury.

We recognize that, in hindsight, it might have been better for the district court to let the jury go home and return the next day. However, we cannot say, under this particular set of facts, that the Allen charge was inherently coercive or that the district court abused its discretion in giving it. The record does not indicate that the jurors requested dinner, or that their request was rejected. Moreover, there is no indication that a juror's child-care issue was left unresolved. And, around 5:40 p.m., the district court did allow the jury to take a break during deliberations.

More importantly, our precedent does not prohibit giving the Allen charge under similar, or even more extreme, circumstances. See Scruggs, 583 F.2d at 239-41 (5th Cir. 1978) (holding that an Allen charge was not inherently coercive where the jury began deliberating a 5:45 p.m. on a "stormy Friday evening," the judge sua sponte gave the Allen charge at 10:28 p.m., and the jury returned a verdict 48 minutes later, at 11:26 p.m.); United States v. Betancourt, 427 F.2d 851, 853 (5th Cir. 1970) (finding no abuse of discretion in giving the Allen charge where the jury began deliberating at 6:13 p.m., the district court gave the Allen charge at approximately 8:20 p.m., and the jury returned a guilty verdict at 10:23 p.m.); see also Brooks v. Bay State Abrasive Prods., Inc., 516 F.2d 1003, 1004 (5th

Cir. 1975) (holding that an <u>Allen</u> charge was not coercive where the jury began deliberating at 7:20 p.m., received the <u>Allen</u> charge around 10:50 p.m., and returned a final verdict at 11:09 p.m.).

In sum, "[w]hile we think it preferable that juries not be kept late in the evening, we must conclude . . . that the timing complained of does not allow us to find that the jury was coerced." <u>Scruggs</u>, 583 F.2d at 241; <u>see also</u> <u>Frazier</u>, 387 F.3d at 1259 ("[U]nder the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call." (internal quotation marks omitted)).

Accordingly, we find no abuse of discretion in the district court's decision to give the <u>Allen</u> charge, and we affirm Bush's convictions.

**AFFIRMED.**

26