[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10822
Non-Argument Calendar
_____

D.C. Docket No. 4:14-cr-00051-RH-CAS-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

GABRIEL SCOTT HAMDA,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
_____

(April 13, 2016)

Before JULIE CARNES, JILL PRYOR and FAY, Circuit Judges.

PER CURIAM:

After entering a conditional guilty plea, Gabriel Hamda appeals his convictions for possession with intent to distribute a controlled substance and possession of a firearm and ammunition transported in interstate commerce by a convicted felon.  Specifically, Hamda argues on appeal that the district court erred in denying his motions to suppress.  After careful review, and for the reasons set forth below, we affirm.

I.

A grand jury indicted Hamda in 2014 for knowingly and intentionally possessing with intent to distribute controlled substances, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C), (b)(1)(D), and (b)(2) (Count 1); and, as a convicted felon, knowingly possessing a firearm and ammunition that had traveled in interstate commerce, in violation of 18 U.S.C. §§ 922(g)(1) ad 924(a)(2) (Count 2).  Hamda filed a motion to suppress the drugs, firearms, and ammunition (which formed the basis of his charges), as well as clothing and money that police found in his home during a search pursuant to a warrant.  The district court denied that motion, and Hamda thereafter filed a supplemental motion to suppress, arguing that two additional unwarranted entries and searches of his home (prior to the search pursuant to a warrant) violated the Fourth Amendment.

Tallahassee Police Department Officer Rob Newberry obtained the search warrant at issue in this case.  In his affidavit in support of the warrant, Newberry

testified to the following facts.  On December 8, 2013 at 1:51 a.m., a police officer responded to a report of shots fired at the Recess Nightclub in Tallahassee.  The club's manager, Patrick Bilyk, stated that a disturbance occurred involving "a black male in his mid-20s, shaved head, 6'2, 200 lbs., wearing jeans and a blue and white plaid shirt."  Doc. 18-1 at 2.  The suspect apparently retreated into the nightclub's bathroom, and Bilyk and two security guards followed the suspect into the bathroom and attempted to escort him out of the club.  As the four men walked towards the door, the suspect threw a drink on a patron and pushed one of the guards, Michael Lewis.  Lewis put the suspect in a headlock, and, while the two were engaged, the suspect pulled out a handgun (that Bilyk believed to be a small caliber handgun) and shot two rounds into the air.  The suspect fled and Bilyk saw him pull off his plaid shirt, revealing a white tank top underneath.  The suspect got into a car with an unknown female and fled.  Newberry showed Bilyk a lineup two days after the incident and he identified Hamda as the suspect "with 100% certainty."  *Id.* at 3.

Officer Newberry also testified to Lewis's account of the events, which corroborated Bilyk's account.  Lewis described the suspect similarly, recalling him as "a black male, mid 20's, short hair, 6'0, 180 [lbs], wearing a blue and white plaid shirt, and jeans."  *Id.*  When shown a police lineup, Lewis opined that one of

3

two individuals in the lineup might be the suspect he saw at the nightclub; Hamda was one of these two.

Newberry's affidavit included the account of a third witness, Joshua Samman. Samman told Newberry that he had attended high school with Hamda and was "certain the suspect was Hamda." *Id.* at 2. He saw the security guards walking Hamda out of the bathroom and, although he briefly lost sight of the men, he heard gunshots and then "saw Hamda tear off his green/white plaid shirt exposing a white tank underneath." *Id.*

The affidavit further detailed Hamda's criminal history, including "numerous drug and weapon charges." *Id.* at 3. Newberry identified a residence believed to be Hamda's based on current utilities for the property and Hamda's provision of that address to a law enforcement officer in August 2013. The affidavit then stated that, based on Newberry's experience in law enforcement, "[t]here is probable cause to believe Hamda maintains the firearm, clothing, and ammunition used in these crimes at his known residence and or the vehicles registered to him." *Id.* A judge found probable cause and issued the warrant.

The district court denied Hamda's first motion to suppress based on the inadequacy of the search warrant, concluding that the evidence police sought— firearms, ammunition, and clothing—was the type a suspect reasonably would keep in his home. Alternatively, the court concluded that the motion was due to be

4

denied because the police officers who executed the search acted in reasonable reliance on the warrant.

Hamda then filed a supplemental motion to suppress, arguing that two initial unwarranted entries and searches of his home violated the Fourth Amendment and required suppression of the evidence police found.  The district court heard a hearing on this motion, and the following facts were elicited.

Newberry began investigating the nightclub shooting the day after the incident, December 9.  He obtained an arrest warrant on December 11 and supervisory approval to seek a search warrant the following day.  He completed an affidavit in support of the search warrant on December 12 but did not obtain a signed search warrant that day because, based on Hamda's criminal history, such a search warrant executed simultaneously with an arrest warrant would have been "a tactical search warrant."  Doc. 58 at 8.[1]  A tactical search warrant required more police personnel than an ordinary case.  Newberry preferred instead to turn the arrest warrant over to U.S. Marshals who could arrest Hamda at his residence and secure the location, after which Newberry could obtain and execute a signed search warrant following the department's ordinary procedures.

Newberry and a team of U.S. Marshals and Tallahassee police arrested Hamda at his residence on December 13.  Before the arrest, Newberry and a small

---

[1] "Doc." refers to the docket entry in the district court in this case.

5

team of officers secured the exterior of the home and set up a perimeter in case Hamda fled.  A team of U.S. Marshals and police then announced their presence at the front door.  Hamda voluntarily came to the door and was arrested without incident outside his home.  Hamda's girlfriend, Brittany DeGagne, also was in the house.  She testified that she stood outside for 10 or 15 minutes after Hamda was arrested.  She did not know where Hamda was during that period.

Although Newberry testified that he had no knowledge of a protective sweep, defense counsel introduced evidence that, immediately after Hamda's arrest, officers entered the house to ensure that it was "clear."  Tallahassee Police Department Officer Jeff Mahoney, a member of the Career Criminal Unit tactical team, testified that he participated in the protective sweep.  He believed the sweep was warranted because, before he and his teammates arrested Hamda, he heard footsteps on the stairs.  He testified that it could have been Hamda, but it could have been someone else.  Moreover, considering that there were "guns involved," a protective sweep was appropriate.  *Id.* at 68.  In effecting the sweep, Mahoney stood at the foot of the stairs of the residence while officers swept the first and second floors.  He testified, "this didn't take more than a few minutes to do.  Once it was swept, we exited, and we held the residence."  *Id.* at 56.  Then, after Mahoney and his team exited the residence, they "gave the scene to" investigators (without specialized tactical training) and "went on [their] way."  *Id.*

6

Newberry apparently joined the arresting team at the front door just after the officers completed a protective sweep. No one had a gun drawn at that point. A marshal informed Newberry that Hamda had requested a lawyer, and Newberry confirmed with Hamda that he did not want to speak with the officers. Then, Newberry testified, he "immediately left the scene, went to the county courthouse looking for a judge to sign off on the affidavit that [he] already printed the previous day." *Id.* at 10. Newberry did not add anything to his affidavit that he learned once he reached the residence. Newberry located a judge, who signed the warrant. Newberry then "notified [his] supervisor . . . that [he] had a warrant in hand and was returning." *Id.*

According to DeGagne's testimony, at some point after Newberry departed but before he returned with a warrant, and while DeGagne remained outside, officers entered the home again. DeGagne testified that an officer questioned her about several firearms found in the house, including two in a suitcase with women's clothing in it. She testified that an officer told her at this point that someone was "leaving to go get" a search warrant. *Id.* at 107. After the officer questioned her, DeGagne returned inside the house. Hamda was already inside, sitting in a chair. Other officers were inside as well. DeGagne testified that, when Newberry returned with a warrant, she was taken back outside and Hamda was placed in a patrol car, which departed within a few minutes.

7

Newberry testified that, when he returned to Hamda's residence, Hamda was sitting inside. (Another investigator, Gregory Wilder, testified that Hamda was still outside when Newberry arrived, but that the two went inside while discussing the warrant.) Newberry testified that he was unaware at the time that there had been another sweep of the residence in the period between his departure and return; he thought officers had brought Hamda directly inside for "comfort." *Id.* at 46. Shortly after Newberry returned, a forensics officer entered the home and videotaped the scene. After the officer completed the videotaping, investigators searched the residence. Their search revealed several firearms, narcotics, drug paraphernalia, cash, and clothing matching the description of the suspect in Newberry's affidavit.

After the hearing, the district court denied the supplemental motion to suppress. The court assumed that the protective sweep was unconstitutional and concluded that the subsequent warrantless search was unconstitutional, but denied the motion to suppress based on the independent source doctrine, reasoning that "[t]he investigating officer would have applied for and obtained the search warrant, and the search that led to seizure of the evidence would have occurred just as it did, even if the two earlier searches had not occurred." Doc. 34 at 1.

Hamda then entered into a negotiated conditional guilty plea for both counts alleged in the indictment in which he reserved his right to appeal from the denial of

the motions to suppress.  The district court accepted the plea and sentenced Hamda to 70 months' imprisonment.  This is Hamda's appeal.

## II.

In reviewing a district court's denial of a motion to suppress, we examine the district court's findings of fact for clear error and its application of the law to those facts *de novo*.  *United States v. Ramirez*, 476 F.3d 1231, 1235 (11th Cir. 2007).  Further, when considering a motion to suppress, we construe the district court's factual determinations in the light most favorable to the prevailing party, here, the government.  *See United States v. Newsome*, 475 F.3d 1221, 1223-24 (11th Cir. 2007).

We review *de novo* whether a search warrant affidavit established probable cause.  *United States v. Mathis*, 767 F.3d 1264, 1274-75 (11th Cir. 2014).  "Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location."  *United States v. Brundidge*, 170 F.3d 1350, 1352 (11th Cir. 1999).  "We give great deference to a [district] court judge's determination of probable cause."  *Id.* (alteration and internal quotation marks omitted).

III.

As a preliminary matter, we note that the government does not challenge the district court's assumption that the first and conclusion that the second entry into and search of Hamda's home was unconstitutional. The focus, then, is on whether the district court correctly applied the independent source doctrine in denying the motion to suppress. Our analysis of the independent source doctrine encompasses Hamda's challenge to the sufficiency of the search warrant.

"The independent source doctrine involves a two-step process." *United States v. Bush*, 727 F.3d 1308, 1316 (11th Cir. 2013). "First, we excise from the search warrant affidavit any information gained during the arguably illegal initial search and determine whether the remaining information is enough to support a probable cause finding." *Id.* (alteration adopted and internal quotation marks omitted). "Second, if the remaining information establishes probable cause, we determine whether the officer's decision to seek the warrant was prompted by what he had seen during the arguably illegal search." *Id.* (alteration adopted and internal quotation marks omitted). "If the officer would have sought the warrant even without the preceding illegal search, the evidence seized under the warrant is admissible." *Id.*

As to the first step, it is undisputed that Newberry's affidavit contained no information gained during either of the first two entries into Hamda's residence. In

10

fact, Newberry completed his affidavit the day before he and his term arrested Hamda.  Thus, we need not excise anything from the search warrant affidavit in assessing whether the information in it established probable cause.  The district court concluded that the affidavit contained sufficient information.  We agree.

 "Where a warrant to search a residence is sought, the affidavit must supply the authorizing magistrate with a reasonable basis for concluding that Defendant might keep evidence of his crimes at his home, i.e., a safe yet accessible place." *United States v. Kapordelis*, 569 F.3d 1291, 1310 (11th Cir. 2009).  "There need not be an allegation that the illegal activity occurred at the location to be searched, for example the home, but the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity."  *Id.* (internal quotation marks omitted).  Where a warrant affidavit contains evidence that the suspect possessed contraband of a type normally expected to be hidden in a residence (for example, firearms) or where the suspect's contraband is capable of being hidden in a residence (for example, cash from a theft), the warrant usually is valid.  *Id.*  An affiant's experience with the type of criminal activity at issue also supports a finding of probable cause.  *See United States v. Jenkins*, 901 F.2d 1075, 1081 (11th Cir. 1990).

Conversely, the link between the residence to be searched and the alleged criminal activity may be diminished where the criminal activity occurred a great

distance from the residence.  *See Kapordelis*, 569 F.3d at 1310 (citing *United States v. Green*, 634 F.2d 222, 226 (5th Cir. Unit B Jan. 1981)).  And stale information does not provide probable cause to support a valid search warrant.  *See United States v. Harris*, 20 F.3d 445, 450 (11th Cir. 1994).

Taken together, and viewing these facts in the light most favorable to the government, we conclude that a sufficient nexus existed between Hamda's suspected involvement in the nightclub shooting and his residence.[2]  The affidavit described several pieces of evidence linking Hamda to the nightclub shooting that likely would be found in the residence, including a plaid shirt, white tank top, a firearm, and ammunition.  Guns, ammunition, and clothing are the types of items we would expect a suspect may hide within his residence.  *See Kapordelis*, 569 F.3d at 1310.  And Newberry is the kind of officer who would have the experience to predict that evidence of the crime would be found in Hamda's residence.  As he stated in his affidavit, Newberry "has over 11.5 years of experience as a sworn law enforcement officer and is currently assigned to the Violent Crimes-Robbery Unit."  Doc. 18-1 at 3.  Moreover, the affidavit sufficiently established that the residence to be searched belonged to Hamda:  utilities for the home were in his name, and he previously had provided that address to police.  Finally, because

---

[2] Although we come to this conclusion in the context of our independent source doctrine analysis, it also applies to Hamda's discreet challenge to the sufficiency of the search warrant. Moreover, because we conclude the district court did not err in determining that the warrant was supported by probable cause, we need not address the government's alternative contention that the challenged evidence nonetheless should be admitted under the good faith exception.

12

Newberry drafted the affidavit three days after the crime and executed it the following day, none of the information he provided was stale. Combined, this information was sufficient to tie evidence police hoped to obtain of Hamda's alleged involvement in the nightclub shooting to Hamda's residence.

Because the information in Newberry's affidavit supported a finding of probable cause, we next ask whether Newberry's decision to seek the warrant was prompted by what he saw during the arguably illegal searches. *Bush*, 727 F.3d at 1316. We conclude that ample evidence supported the district court's conclusion that, "before any search occurred, Mr. Newberry had a firm plan to apply for a warrant." Doc. 34 at 9. Newberry began investigating the nightclub shooting immediately, speaking to several eyewitnesses and showing them lineups to identify Hamda as the suspect. He testified that on December 12, once he had the information he needed, he sought and obtained authority to secure the warrant from his supervisor. That same day, he drafted the affidavit that would support the warrant. What's more, Newberry was absent for the two arguably illegal searches of Hamda's residence.

Nothing in the record indicates that Newberry had changed his mind about securing a warrant. He simply chose to wait until after the arrest was made to complete the process. It is of no moment whether Newberry was wise to wait until after the arrest to secure the warrant; he clearly had developed a firm plan to obtain

a signed warrant before the two warrantless entries and searches occurred.

Because Newberry was going to get the warrant regardless (and indeed testified

that he was unaware of both arguably illegal searches), and because probable cause

supported the search warrant, the district court was correct to deem the evidence

recovered admissible under the independent source doctrine. The motion to

suppress properly was denied.

**AFFIRMED.**