[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10953
_____

D.C. Docket No. 1:13-cr-20505-RNS-7

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

BLANCA RUIZ,
ALINA FONTS,

Defendants - Appellants.

_____

Appeals from the United States District Court
for the Southern District of Florida
_____

(June 21, 2017)

Before MARCUS, JILL PRYOR, and SILER,[*] Circuit Judges.

SILER, Circuit Judge:

Blanca Ruiz and Alina Fonts were convicted for their roles in a Medicare fraud perpetrated by Health Care Solutions Network, Inc. ("HCSN"). Ruiz was convicted on one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. Fonts was convicted on one count of conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349 and two counts of health care fraud in violation of 18 U.S.C. § 1347. Both Ruiz and Fonts challenge the sufficiency of the evidence against them, claim cumulative error necessitates a new trial, and appeal the imposition of a twenty-two-level increase based on fraud loss calculation when calculating their Guidelines sentencing ranges. Fonts also appeals the imposition of a two-level leadership enhancement. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Ruiz and Fonts were charged, along with a number of codefendants, with conspiracy to commit health care fraud in violation of 18 U.S.C. § 1349. Fonts was separately charged with two substantive counts of health care fraud in violation of 18 U.S.C. § 1347. A jury convicted Ruiz and Fonts on all of the counts against them. Each was sentenced to a term of seventy-two months'

---

[*] Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

imprisonment to be followed by three years of supervised release and ordered to pay over $10 million in restitution.

## The Fraud at HCSN

Ruiz and Fonts were employees at HCSN, a company operating partial hospitalization programs ("PHPs"). There were eventually three HCSN facilities. Two were located in Miami: HCSN-East and HCSN-West. The third facility was in North Carolina. Each facility had a medical director who was a doctor, a clinical director, a group of therapists, and a number of support staff. Both Ruiz and Fonts worked primarily at HCSN-West, although Ruiz also spent a brief period at HCSN-East.

PHPs offer mental health treatment that is either a step up from outpatient care or a step down from inpatient treatment in a mental health ward. A PHP provides intensive, all-day treatment up to six days per week and engages patients with treatment activities throughout the day. Treatment plans are customized for each patient, and PHPs seek to stabilize symptoms and to keep patients out of the hospital. Patients are most often referred to PHPs by other mental health professionals. Paying kickbacks for PHP referrals contravenes medical ethics and violates federal law, *see* 42 U.S.C. § 1320a-7b(b)(2)(A). Medicare does not prescribe a fixed length of time for a stay in a PHP, but a typical stay lasts two to three weeks and longer stays generally demonstrate that the treatment is

3

ineffective.  The attending psychiatrist decides when a patient is discharged, but a PHP discharging a patient at one location only to readmit him at another location after a set interval of time likely indicates that neither admission was predicated upon patient needs.

Medicare imposes documentation requirements for each patient at a PHP from intake to discharge.  *United States v. Moran*, 778 F.3d 942, 951 (11th Cir. 2015).  Intake notes include patient history, symptoms, and notes from other doctors.  While therapy is ongoing, therapists record the treatment provided to each patient and the patient's level of participation in therapeutic activities.  Such notations should be made promptly and backdating notes is inappropriate.  All information in patient files, including treatment records and therapy notes, should be truthful.

HCSN billed Medicare for medically unnecessary treatments that were often not even provided to patients.  Participants in the fraud recruited PHP patients without regard to their suitability for such a program.  Kickbacks were paid to mental health workers in hospitals and assisted care facilities who referred Medicare beneficiaries to HCSN facilities.  Some HCSN employees enrolled their parents in order to receive kickbacks themselves.  Many HCSN patients suffered from dementia or other memory problems making therapy useless and slept through the therapy sessions that were offered.

4

There was rampant fabrication of documentation to maintain appearances that the facility complied with Medicare requirements. This included inventing information for patient files during intake, having unqualified individuals conduct intake interviews, and having doctors sign admissions documents without reviewing the files or meeting with the patients. Group therapy notes were fabricated, and when group therapy sessions did occur notes were altered if they indicated that a patient fell asleep, did not participate, or was suffering from memory problems. Therapy notes were copied and pasted from one session to another so that patients' files contained multiple versions of the same notes. Therapists were instructed in how to write their notes to meet Medicare requirements, regardless of the notes' accuracy. At both HCSN facilities located in Florida, there were also lists of non-existent ghost patients for whom HCSN billed Medicare. The group in the HCSN-West facility was called the "white group," named after Casper the ghost.

Once a patient was enrolled at an HCSN facility, there was a concerted effort to keep him there for as long as possible. This resulted in Medicare being billed for 612 days of services for a single patient, even though a normal stay in a PHP lasts no more than three weeks. Patients were cycled between HCSN facilities and were sent to other fraudulent PHPs. Approximately four to six weeks after a patient was discharged from one facility, he would be perfunctorily

admitted at a different facility.  HCSN-West contained a whiteboard with detailed information as to when patients were discharged and how long HCSN had to wait before readmitting them without raising regulatory suspicion.

### The Defendants

Ruiz was a registered mental health intern counselor.  She worked primarily in HCSN-West's intake department inputting patient history information after meeting with patients and bringing patient files to the attending psychiatrist who would design a treatment plan.  She also worked briefly at HCSN-East.

Fonts was a registered mental health counselor at HCSN-West.  Initially she had similar job responsibilities to Ruiz, but during the final months of her employment she was the "clinical coordinator and responsible for running groups." Fonts was the de facto clinical director of HCSN-West during that period.

### STANDARD OF REVIEW

We review the sufficiency of evidence to support a conviction de novo while viewing the evidence in the light most favorable to the jury's verdict and resolving all credibility evaluations in favor of the jury's verdict.  *Moran*, 778 F.3d at 958. Evidentiary rulings are reviewed for an abuse of discretion.  *United Sates v. Tokars*, 95 F.3d 1520, 1530 (11th Cir. 1996).  Unpreserved claims are reviewed for plain error.  *United States v. Olano*, 507 U.S. 725, 734 (1993).

Claims of prosecutorial misconduct are reviewed de novo. *United States v. Merrill*, 513 F.3d 1293, 1306 (11th Cir. 2008). Review of a claim of cumulative error is de novo. *United States v. Dohan*, 508 F.3d 989, 993 (11th Cir. 2007). Giving an *Allen* charge is reviewed for an abuse of discretion. *United States v. Woodard*, 531 F.3d 1352, 1364 (11th Cir. 2008). A verdict following an *Allen* charge will only be reversed when there is a finding that the charge was "inherently coercive." *United States v. Dickerson*, 248 F.3d 1036, 1050 (11th Cir. 2001).

The fraud loss calculation is reviewed for clear error. *United States v. Barrington*, 648 F.3d 1178, 1197 (11th Cir. 2011). We also review the assessment of an aggravating role enhancement for clear error. *United States v. Martinez*, 584 F.3d 1022, 1025 (11th Cir. 2009).

## DISCUSSION

### I. Sufficiency of the Evidence

#### a. Ruiz

Ruiz was solely charged with one count of conspiracy to commit healthcare fraud, distinguishing her from each of her co-defendants who were also separately indicted for substantive healthcare fraud. To obtain a conviction on a charge of conspiracy to commit healthcare fraud in violation of 18 U.S.C. § 1349, the government must prove beyond a reasonable doubt that: (1) a conspiracy existed;

7

(2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it. *United States v. Vernon*, 723 F.3d 1234, 1273 (11th Cir. 2013). Conspiracy can be proven by circumstantial evidence since it is a predominantly mental crime. *See United States v. Mateos*, 623 F.3d 1350, 1362 (11th Cir. 2010) (affirming Medicare fraud convictions based on circumstantial evidence of knowledge). The government is not required to prove that the defendant knew all the conspiracy's details, only its essential nature. *See Moran*, 778 F.3d at 960.

There was ample testimony implicating Ruiz in the creation of false documentation to support Medicare claims. Ruben Busquets testified generally that a willingness to fabricate medical records was a job requirement at HCSN-East (Ruiz worked there briefly), and John Thoen testified that those who, like Ruiz, performed patient intake interviews were instructed to avoid using certain "buzzwords" that might trigger regulatory scrutiny or the rejection of a claim. Thoen also testified that Ruiz created documents for a December 2007 Medicare review and that those documents were inaccurate. Gema Pampin testified that she and Ruiz falsified patient intake documentation while they worked together. Alexandra Haynes testified that when she was hired at HCSN she was instructed to determine if documents were missing from medical files, write up those missing documents, and then give them to another employee who worked in the same

8

office as Ruiz.  This creates the inference that Ruiz was aware of and supervised this falsification of medical records for Medicare review.

Haynes also testified regarding a meeting she had with Armando Gonzalez, the owner of HCSN, regarding Ruiz.  It had been decided that either Ruiz or another employee needed to be fired, and Gonzalez chose to fire Ruiz since "he knew that he could trust Blanca Ruiz to not turn him in to Medicare because she was aware of all the fraud that had been committed, everything that [HCSN] did wrong, and he knew that she was a good person and that she would cover for him at the end of the day."  Ruiz did not report HCSN's fraud to Medicare.

During the criminal investigation, Ruiz told investigators she was aware that HCSN paid kickbacks.  At trial, the testifying agent initially said that Ruiz had told him she was unaware of kickbacks but amended his answer after reviewing the interview report.  This awareness distinguishes Ruiz's case from *United States v. Willner* upon which she relies.  795 F.3d 1297 (11th Cir. 2015).  In *Willner*, no evidence was offered to show Dr. Abreu, who had her conviction for conspiracy to commit healthcare fraud reversed, was aware kickbacks were being paid.  *Id.* at 1309.

Testimony tied Ruiz to the creation of documentation for the "white group" of patients who never received treatment at HCSN.  John Thoen read a document listing Ruiz as being responsible for documentation of the "white group" and

9

described her actions in that role.  Another document listed Ruiz as the therapist affiliated with the "white group" as of January 23, 2008.  Names were commonly forged and otherwise improperly signed onto documents throughout HCSN, but this paper trail tends to show that Ruiz was involved with the fictional "white group" of patients.

Evidence that Ruiz was compensated for maintaining the "white group" of non-existent patients consisted of a check made out to Ruiz's company containing the notation "notes."  Only four individuals received checks with "notes" in the memo line.  Two of those individuals testified that their checks were compensation for maintaining the patient list for a non-existent group of patients at HCSN-East.  Based on that testimony, a reasonable jury could find that Ruiz too received remuneration for maintaining a "white group" of patients who did not receive treatment at HCSN-West.  This further distinguishes Ruiz from Dr. Abreu in *Willner*, where we noted the lack of evidence that she gained anything from the conspiracy.  795 F.3d at 1310.  Sufficient evidence was before the jury to convict Ruiz of conspiracy to commit healthcare fraud.

### b.  Fonts

#### i.  Conspiracy to Commit Healthcare Fraud

There is also sufficient evidence to support Fonts's conviction for conspiracy to commit healthcare fraud.  Busquets testified that Fonts needed to

fabricate group therapy notes to keep her job. Fonts altered a patient's prescribed medication to hide the fact that the patient had dementia and should have been disqualified from participating in a PHP. She was responsible for finding missing documentation for the December 2007 Medicare review and documents were falsified for the purpose of that review. Thoen testified that Fonts fabricated documentation for the "white group" of fictional patients. Thoen also testified that there were no patients at HCSN-West facility during his visits while Fonts served as de facto clinical director, suggesting that every patient listed as receiving treatment at HCSN-West during early 2009 was part of the fictitious "white group." Fonts, like Ruiz, received checks containing the word "notes" in the memo line written out to her as payee, creating the same reasonable inference that Fonts received additional compensation for managing the "white group" patients. Lisset Palmero, an office manager at HCSN-East, testified that Fonts managed the billing spreadsheet at HCSN-West tracking kickbacks. Fonts had her own parents admitted to HCSN in order to receive a referral kickback.

Fonts also persuaded ownership to hire her son ("Wilson") to assist her in drafting fabricated therapy notes to be used by the HCSN facility in North Carolina. Fonts and Wilson faxed fraudulent notes to the North Carolina facility to be placed in patient files when workers in the North Carolina facility refused to

11

create false documentation.  The evidence was sufficient to find Fonts guilty of conspiracy to commit healthcare fraud.

### ii.  Substantive Healthcare Fraud

Fonts also challenges the sufficiency of the evidence supporting her convictions on two counts of substantive healthcare fraud under 18 U.S.C. § 1347. A defendant violates § 1347 if she "knowingly and willfully executes, or attempts to execute, a scheme or artifice (1) to defraud any health care benefit program; or (2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items or services."  18 U.S.C. § 1347.  The specific allegations were that Fonts submitted false and fraudulent Medicare and Medicaid claims seeking reimbursement of $225 on each claim for treatment not provided to the two listed beneficiaries.  These claims were based on group therapy notes from March and April 2009.

Fonts's claim is that her signature was forged onto the group therapy notes underlying the specific Medicare claims.  There was testimony that signatures were commonly forged at HCSN, but we need not ultimately consider whether a reasonable jury could have found that the purported signatures were actually hers. Under a *Pinkerton* theory of liability, the jury could have convicted Fonts for a

reasonably foreseeable crime committed during and in furtherance of the conspiracy of which she was a part. *See Moran*, 778 F.3d at 961. We affirm her conviction on this basis. Fonts was not only a member of the HCSN conspiracy but acted in a supervisory role overseeing the creation of fraudulent medical records seeking Medicare reimbursement. Since a significant aspect of the fraud was the creation of fraudulent medical records, it was foreseeable that those records would be submitted to Medicare in furtherance of the conspiracy's aim to bilk Medicare of funds.

## II.    Trial Proceedings

Both Ruiz and Fonts challenge a series of trial rulings. None of these challenges or their cumulative effect necessitates reversal for new trials.

### a.  Ruiz

Ruiz claims five errors cumulatively rendered her trial constitutionally defective. Her first challenge is to the admission in evidence of Medicare rules, guidelines, and ethical standards and to jury instructions allowing their consideration. The Medicare rules were admitted through the testimony of Rebekah Paone, a government witness who investigated Medicare fraud at HCSN for a private company. She testified that during her review she viewed local coverage determinations ("LCDs"), which are state-specific criteria for Medicare reimbursement. Over defense objection, the district court admitted in evidence

Florida's LCDs for PHPs and contemporaneously instructed the jury that any violation of the standards listed in the LCDs is not a crime but "may be relevant in determining whether a defendant acted with criminal intent, that is, knowingly, willfully, and with intent to defraud Medicare." The same instruction regarding LCDs was repeated during the jury charge.

Ruiz challenges the admission of the LCDs on two bases. The first basis is a lack of testimony that Ruiz knew of or received any training regarding Medicare rules and a lack of testimony that she was even aware of the LCDs. The lack of testimony that Ruiz was trained in the LCD standards does not rebut their relevance as evidence through providing background information on Medicare coverage of PHPs. *See Willner*, 795 F.3d at 1302. She asserts that the government introduced the LCDs in order to lower the burden of proof needed to obtain a conviction against her, but the court's limiting instruction sufficiently addressed that concern. The court made clear that a violation of the LCD standards was not evidence of a criminal act and that the evidence could only be considered for its possible relevance in determining *mens rea*. Juries are presumed to follow court instructions, *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993), and there is no reason to believe that the jury failed to do so here. Ruiz's second basis for challenging the admission of the LCDs is that those admitted in evidence contained effective dates "until February 2009" and "as of 2010" while Ruiz left HCSN in

14

2008.  Since the LCDs were only offered for background information and were not the standard against which Ruiz's conduct was judged in determining criminal liability, this is insufficient to find the district court abused its discretion by admitting the evidence.

Ruiz's second challenge involves *Brady*, the Jencks Act, and handwritten notes regarding Ruiz's interview with the FBI where she admitted awareness of kickbacks.  The court reviewed the handwritten notes *in camera* and concluded that they were not *Brady* material.  Inculpatory information is not subject to *Brady* disclosure, *see, e.g.*, *United States v. Jordan*, 316 F.3d 1215, 1251-52 (11th Cir. 2003), and Ruiz's awareness of kickbacks was inculpatory information.  Rough drafts or preparatory notes fall outside the Jencks Act when the government agent prepares and discloses the report forming the basis of the agent's testimony.  *See United States v. Soto*, 711 F.2d 1558, 1562 (11th Cir. 1983).  Here, the final report was properly disclosed so no error occurred.

Ruiz's third claim of error focuses on the testimony and questioning of FBI Special Agent Cox.  The prosecutor asked Cox whether it was unusual in his experience that someone would confess to knowing that kickbacks were being paid at their workplace.  Defense counsel successfully objected to the question before it was answered, but Ruiz claims asking the question ran afoul of our holding in *United States v. Sorondo*.  845 F.2d 945 (11th Cir. 1988).  In *Sorondo*, we

15

overturned a conviction where the government introduced evidence on rebuttal that an informant who testified during the government's case-in-chief had provided information leading to over one hundred convictions. *Id.* at 949-50. We determined that this created an improper risk that the jury credited the informant's testimony on the basis of those other convictions and so based its decision on something not in evidence. *Ibid.* This case, where there was no testimony regarding other prosecutions and the court sustained an objection to the question, is entirely unlike *Sorondo*. The objection was sustained, and the prosecutor asking the question does not necessitate reversing Ruiz's conviction.

Ruiz's fourth claim of error is that her ability to present an effective closing argument was impaired by the court's instruction that closing arguments be limited to just "the evidence and any reasonable inferences from the evidence." This instruction to counsel was not in error (much less plain error), as evidenced by the cases Ruiz cites in her brief. In each of those cases, we made clear that closing arguments must relate to the evidence adduced at trial. *See, e.g.*, *United States v. Bailey*, 123 F.3d 1381, 1400 (11th Cir. 1997) (holding there is no prohibition on colorful and flamboyant remarks so long as they relate to the evidence adduced at trial). That is exactly what the district court required here. It is also unclear from Ruiz's briefing what counsel would have said in closing argument had the court

16

not given its instruction. Even after the instruction, counsel equated the government's witnesses with cockroaches.

Ruiz's final claim challenges the court's initial refusal to grant an *Allen* charge as to the conspiracy charge and then later giving an *Allen* charge as to the other charges. Ruiz argues that this combination of rulings confused and coerced the jury. After deliberating for over two days, the jury told the court it could not reach a unanimous verdict on the conspiracy count. Defendants moved for an *Allen* charge, but the court declined. Instead, the district court instructed the jury to consider the substantive counts and then return to the conspiracy count. When the jury returned another note three hours later saying it was deadlocked as to some of the substantive counts, the court gave a modified *Allen* charge taken from pattern jury instructions. The court orally prefaced its instruction with an admonition thanking the jury for paying attention to the evidence during the lengthy trial and telling them "please don't feel like I'm pressuring you and forcing you to go back there and do something that's against your conscience." After another hour and a half, the jury returned its verdicts.

While there is no bright-line requirement for how long a jury must deliberate before an *Allen* charge is appropriate, *United States v. Bush*, 727 F.3d 1308, 1320-21 (11th Cir. 2013), the jury was in its third day of deliberations when the *Allen* charge was given. The court used the pattern jury instruction and prefaced the

instruction saying the purpose of the instruction was not to apply pressure to reach a verdict quickly.  The jury did not return a verdict as to all defendants even after receiving the *Allen* charge, so the jury was not intimidated or coerced into reaching a guilty verdict against Ruiz.  The district court did not abuse its discretion in either denying the request for an *Allen* charge after the jury returned its first note or in giving an *Allen* charge after the jury returned its second note.

### b. Fonts

Three of Fonts's challenges to trial rulings mirror claims made by Ruiz. Fonts contests the district court's limiting the scope of closing argument, alleges prosecutorial misconduct through vouching for FBI Special Agent Cox and inflaming the passions of the jury, and challenges the district court's rulings first denying then giving a modified *Allen* charge.  We reject Fonts's challenges for the same reasons we reject Ruiz's identical challenges.  Fonts also asserted that the issuance of a deliberate ignorance instruction added to the jury's confusion, but a single-sentence argument is considered waived.  *See Zhou Hua Zhu v. U.S. Att'y. Gen.*, 703 F.3d 1303, 1316 n.3 (11th Cir. 2013).

Fonts also raises two additional claims of trial error.  Her first additional claim of error is that the government intimidated Alina Feas, another employee at HCSN called by another defendant as a witness.  Feas pleaded guilty to charges in connection with the fraud at HCSN, but then filed a motion to withdraw her plea

18

claiming ineffective assistance of counsel under 28 U.S.C. § 2255. When the government learned that defendant Rousseau planned to call Feas as a witness, the government contacted the attorney that filed Feas's § 2255 motion. There is some dispute as to the manner and tone of voice used during that conversation, but it is clear that the prosecutor conveyed that Feas could commit perjury if she testified on behalf of the defense and that Feas stated she was afraid as a result of the communication. The district court conducted a hearing the day before Feas was scheduled to testify during which she admitted to perjuring herself during her prior plea colloquy, and on that basis the court determined there was no legal basis for declining to testify. The following day, Feas testified in general accord with what she had told the court the day prior, including saying she had perjured herself during her plea colloquy.

While reversal is necessary when the government substantially interferes with a defense witness's "free and unhampered choice" to testify, *United States v. Terzado-Madruga*, 897 F.2d 1099, 1108 (11th Cir. 1990), that did not occur here. Fatal to Fonts's claim is that she cites no authority suggesting a constitutional violation can occur when the witness testifies. Further, but not necessary to our holding, Feas was called as a witness by another defendant and so it is not certain that Fonts's ability to present her defense was prejudiced. Since Feas admitted to perjuring herself, it was acceptable for the government to notify Feas's counsel that

19

she could face prosecution even if the manner of notification could have been more effective (such as notifying the court). A subjective state of fear in relation to giving testimony in open court is insufficient for a finding that a constitutional violation occurred. Since Feas testified and did so in accordance with the proposed testimony she gave at a hearing the day before, the government did not substantially interfere with Fonts's ability to present her defense. Fonts's assertion that the government's actions affected Feas's demeanor and the strength of her testimony is also insufficient to necessitate reversal as the strength of a witness's testimony is not the focus of our substantial interference inquiry.

Fonts asserts that the admission of testimony that she had her parents who did not medically qualify for PHP treatment admitted to HCSN for the purpose of a kickback was in error since she was not charged with soliciting kickbacks. Applying a Federal Rule of Evidence ("Rule") 404(b) framework, Fonts challenges the relevance of the evidence to a proper purpose and the sufficiency of the evidence presented to prove the bad act occurred, argues that the evidence was unfairly prejudicial, and asserts that it was not intrinsic to the conspiracy offense. The evidence was admitted by the district court not under Rule 404(b) but instead as intrinsic to the charged conspiracy. For evidence to be admissible as intrinsic to the offense, it must be "(1) an uncharged offense which arose out of the same transaction or series of transactions as the charged offenses, (2) necessary to

20

complete the story of the crime, or (3) inextricably intertwined with the evidence regarding the charged offenses." *United States v. Ford*, 784 F.3d 1386, 1393 (11th Cir. 2015) (citation and alterations omitted). Fonts was charged with fabricating and falsifying medical records to reflect treatment services which were not provided to patients at HCSN facilities. Testimony that Fonts had her parents admitted to HCSN so that she would receive a kickback is "inextricably intertwined" with the charged healthcare fraud conspiracy whose purpose was to bill Medicare for unnecessary and nonexistent treatments. Since the evidence was properly admitted as intrinsic to the charged conspiracy, analysis under Rule 404(b) is unnecessary.

## III.    Sentencing Proceedings

For Ruiz, the district court calculated a final offense level of 30 and a criminal history category of I, giving her a guidelines sentencing range of 97-120 months. For Fonts, the district court calculated a final offense level of 32 after imposing a two-level leadership enhancement and a criminal history category of I, giving her a guidelines sentencing range of 121-151 months. Both were sentenced to seventy-two-month terms of imprisonment followed by three years of supervised release and ordered to pay restitution exceeding $10 million. Both challenge the district court's loss calculation, and Fonts separately challenges her leadership enhancement.

The challenges to the loss calculation are based on attribution. Ruiz's guidelines sentencing range was calculated using a loss amount of $22,589,625 and Fonts's guidelines sentencing range was calculated using a loss amount of $26,742,075. Both result in a 22-level increase as the loss amount attributed to each was greater than $20 million. If the loss amount had been more than $7 million but less than $20 million, then a 20-level increase would have been applied instead.

Defendants can be held accountable both for losses they intended to inflict and for losses stemming from the reasonably foreseeable acts of co-conspirators done in furtherance of the conspiracy. *Moran*, 778 F.3d at 973-74. The government must prove the attributable loss by a preponderance of the evidence using reliable and specific evidence. *United States v. Dabbs*, 134 F.3d 1071, 1081 (11th Cir. 1998). When determining loss amount, a district court is required to make only a reasonable and not a precise determination since the amount of loss caused by fraud is often difficult to calculate with absolute precision. *United States v. Miller*, 188 F.3d 1312, 1317 (11th Cir. 1999).

The district court did not clearly err in its loss determinations. The amounts attributed to both Ruiz and Fonts were based on trial evidence of the amounts billed to Medicare by HCSN while each was employed there, specifically four exhibits containing all Medicare billings submitted during their employment. The

court gave defense counsel the opportunity to re-review those exhibits and submit any specific objections, but the defendants raised none.  We also note that neither Ruiz nor Fonts has showed that her sentencing outcome would have been different under the lower loss calculation amount they seek.  Even reducing their guidelines sentencing ranges by two levels, Ruiz would have faced a guidelines sentencing range of 78-97 months and Fonts a range of 97-121 months.  Both women were sentenced to seventy-two-month terms of imprisonment, so their sentences would still have been below the guidelines range.  This means Ruiz and Fonts cannot show prejudice.

Fonts also challenges the imposition of a two-level leadership enhancement or in the alternative a special skills enhancement.  To apply a two-level leadership enhancement, the government must prove by a preponderance of the evidence that Fonts exercised authority over at least one person.  *United States v. Perry*, 340 F.3d 1216, 1217 (11th Cir. 2003) (per curiam).  Fonts only contests the supervision prong.  There was testimony that Fonts was the clinical director supervising employees at HCSN-West during the first half of 2009 and that she supervised her son in the falsification of therapy notes for use by the North Carolina facility.  Fonts relies on her lack of a license to interact with patients without supervision, but this does not rebut the evidence that Fonts supervised the production of

23

fraudulent therapy notes by her son and so does not show the district court clearly erred by imposing the two-level leadership enhancement.

AFFIRMED.