[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-12480

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 11, 2012
JOHN LEY
CLERK

D.C. Docket No. 1:09-cr-00240-KD-N-1

UNITED STATES OF AMERICA,

                                        Plaintiff - Appellee,

                        versus

JOSE NORIEGA,

                                        Defendant - Appellant.

_____

Appeals from the United States District Court
for the Southern District of Alabama

_____

Before TJOFLAT and CARNES, Circuit Judges, and MICKLE,[*] District Judge.

CARNES, Circuit Judge:

Jose Noriega was convicted of conspiracy and possession of marijuana with

intent to distribute. He has appealed, contending that the district court should

_____

[*]Honorable Stephan P. Mickle, United States District Judge for the Northern District of
Florida, sitting by designation.

have suppressed evidence seized at his property because, he argues, the search was illegal and, in any event, the evidence was insufficient to support his conspiracy conviction. An alternative ground may justify affirming the district court's decision not to suppress the evidence, regardless of whether the search was illegal. Because we do not have the facts necessary to decide the suppression issue on that alternative ground, we do not yet know if it will be necessary to decide whether the search was illegal. And because we are not yet deciding the suppression issue, we do not yet know what evidence to consider in order to decide the sufficiency issue. So, we are sending the case back to the district court for additional factfindings before we decide the suppression and sufficiency issues.

## I.

This story begins with a phone call from an anonymous tipster to a drug task force in Mobile County, Alabama, reporting that people were growing marijuana at three properties within three miles of each other in Eight Mile, an unincorporated community named for its distance from Mobile, Alabama. The tipster said that on each of the three properties, in addition to a house, there was an outbuilding equipped with large air conditioners.

A few days later, six or seven police officers led by Corporal Wilbur Williams went to the properties to investigate the anonymous tip. The first

property the officers went to was located on Jib Road. Two vehicles were parked in the driveway, and there were security cameras on the corners of the house. The property also had an outbuilding behind the house, just as the tipster had alleged.

Corporal Williams obtained an oral search warrant for the Jib Road house from Alabama state court Judge George Hardesty. See Ala. R. Crim. P. 3.8(b) (permitting a judge to issue a search warrant upon oral testimony if circumstances make it reasonable to dispense with a written affidavit). When they served the warrant the officers found inside the house a marijuana growing operation, including high-intensity lighting equipment, voltage-boosting ballasts used to power that lighting equipment, timers, and 119 marijuana plants. In one of the rooms they found surveillance monitoring equipment and a .30-06 rifle with a scope. Williams ran the license plates of the two vehicles parked in the driveway, and one was registered to Juan Sabina.

Corporal Williams called Judge Hardesty and reported what he and the other officers had found inside the house and obtained an oral search warrant for the outbuilding. Officers then searched the outbuilding and found "remnants of a [marijuana] grow[ing] operation," including whole marijuana plants, fragments of other marijuana plants, and two 5-ton air conditioners attached to the outbuilding. Those two air conditioners were each powerful enough to cool a house about twice

3

as large as the outbuilding, and they were used to counteract the heat from the high-intensity lighting equipment, which might otherwise burn the marijuana plants.

Corporal Williams and some of the other officers then went to the second property that had been identified in the anonymous tip, located on Chutney Drive. There they found Omar Huezo, Juan Sabina, and Jose Noriega on the back porch drinking beer. Sabina, the only one of the three who spoke English, told Williams that Noriega owned the Chutney Drive property, and Huezo, with Sabina translating, told Williams that he lived at the Jib Road property.

Based on the anonymous tip, the fact that Sabina, who owned one of the vehicles parked in the driveway at the Jib Road property, was present at the Chutney Drive property, and Huezo's statement that he lived at the Jib Road property, Corporal Williams concluded that those two properties at Jib Road and Chutney Drive were connected to a single criminal conspiracy. Because of that conclusion, and aware that a surveillance system and a rifle with a scope had been found inside the Jib Road house, Williams was concerned that someone posing a threat to the officers' safety might be hiding inside the Chutney Drive house. So he entered the house and walked through it to ensure that no one was hiding inside. During this "protective sweep," Williams saw in plain sight the same type

4

of high-intensity lighting equipment, ballasts, and a timer that he had seen at the Jib Road property. There were, however, no marijuana plants being grown inside the Chutney Drive house at that time.

Just as the tipster had alleged, the Chutney Drive property also had an outbuilding, which was located 50 to 75 yards behind the house and was separated from the backyard by a fence. After conducting the protective sweep of the house, Corporal Williams walked around the outbuilding and smelled an "overwhelming pungent odor of fresh marijuana."

At this point, Corporal Williams prepared a handwritten search warrant affidavit in support of a warrant for the Chutney Drive property. The affidavit stated that Williams had received an anonymous tip that the Chutney Drive property and two other properties had marijuana growing operations and that he had already spoken with Judge Hardesty to request search warrants for the house and outbuilding at the Jib Road property, the first property mentioned in the anonymous tip. Williams' affidavit also included the fact that during his protective sweep of Noriega's house he had seen in a bedroom "the same elaborate electrical system that [he had] observed in the grow rooms at the [Jib Road] location" and that he had "encountered a strong odor of fresh marijuana. . . . [coming] from inside the" outbuilding at the Chutney Drive property. Williams

5

called Judge Hardesty, read him the affidavit, and requested an oral search warrant to search the house and the outbuilding, which Judge Hardesty issued.

Officers then searched the house and the outbuilding at Chutney Drive. Inside the outbuilding, they found a "very large and elaborate marijuana grow[ing] operation," including high-intensity lighting equipment and ballasts, identical to what they had found at the Jib Road address, and 245 marijuana plants. And, consistent with the anonymous tip, attached to the outbuilding were two 5-ton air conditioners. Inside the Chutney Drive house, officers seized and removed the "elaborate electrical system" that Corporal Williams had seen during his protective sweep, as well as something he had not seen: a .22 caliber rifle located near a kitchen window that looked out to the outbuilding.

Corporal Williams and some of the other officers then went to the last property mentioned by the anonymous tipster, located on Kushla McLeod Road. After obtaining yet another oral search warrant from Judge Hardesty, the officers uncovered a marijuana growing operation on the property similar to those at the Jib Road and Chutney Drive properties, including high-intensity lighting equipment, ballasts, timers, an outbuilding with one 5-ton air conditioner attached to it, a garage with another 5-ton air conditioner attached to it, and 160 marijuana plants.

6

## II.

A federal grand jury returned a superseding indictment that charged Noriega, Sabina, Huezo, and four other defendants with conspiracy to possess marijuana with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 846, and possession of marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). It also charged Noriega and Huezo with knowingly possessing a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1), and it included a forfeiture count, see 21 U.S.C. § 853.[1]

Before trial Noriega moved to suppress the evidence seized at his Chutney Drive property, arguing that Corporal Williams conducted an illegal protective sweep of his house and that Williams violated the Fourth Amendment when he walked around the outbuilding without first obtaining a search warrant. The district court denied the motion, finding that Williams' actions were lawful because "articulable facts" led Williams to feel "a heightened sense of danger to the officers." Those articulable facts were that he was "[i]mbued with the

---

[1]One defendant remains a fugitive. Huezo pleaded guilty to the conspiracy charge and to the charge of possessing a firearm in furtherance of a drug trafficking crime, and two other defendants pleaded guilty to the conspiracy charge. Noriega, Sabina, and one other defendant went to trial, but the district court granted that other defendant's motion for a judgment of acquittal after the government's case-in-chief. Sabina was convicted of conspiracy and appealed his conviction, contending that the evidence was insufficient to support the jury's verdict. In a separate opinion issued today, we are affirming Sabina's conviction. See United States v. Sabina, — F. App'x —, No. 10-12604 (11th Cir. April 11, 2012) (unpublished).

7

knowledge of the corroborated tip, the discovery of the large marijuana grow[ing operation] at Jib Road, the high powered rifle positioned close to [the] surveillance monitor [at Jib Road], and . . . the connection of the Chutney [Drive] residence to the Jib Road residence."

The jury found Noriega guilty both of conspiracy to possess, and of possession of, marijuana with intent to distribute but acquitted him of the charge of knowingly possessing a firearm in furtherance of a drug trafficking crime. The presentence investigation report calculated a total offense level of 22 and a criminal history category of I, which generally would lead to a guidelines range of 41 to 51 months imprisonment. But the mandatory minimum prison sentence for each conviction was 60 months, see 21 U.S.C. §§ 841(b)(1)(B), 846, and that became the guidelines range as well, see United States Sentencing Guidelines § 5G1.1(b) (Nov. 2009). The district court sentenced Noriega to 60 months on each of the two counts of conviction, with each sentence to run concurrently, imposed a 5-year term of supervised release, and ordered him to forfeit his Chutney Drive property.

III.

Noriega's first contention is that admission at trial of the evidence seized from his house and outbuilding on Chutney Drive in Eight Mile violated the

Fourth Amendment. We review a district court's denial of a defendant's motion to suppress evidence as a mixed question of law and fact. United States v. Perez, 661 F.3d 568, 581 (11th Cir. 2011). We review only for clear error the court's findings of fact, but we review de novo the court's application of the law to those facts. United States v. Caraballo, 595 F.3d 1214, 1222 (11th Cir. 2010).

A.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. The Amendment, though, is silent about how one's "right . . . to be secure" is to be enforced. See Davis v. United States, — U.S. —, 131 S.Ct. 2419, 2423 (2011). "To supplement the bare text, th[e Supreme] Court created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." Id. That rule "also prohibits the introduction of derivative evidence . . . that is . . . acquired as an indirect result of the unlawful search." Murray v. United States, 487 U.S. 533, 536–37, 108 S.Ct. 2529, 2533 (1988).

The "chief evil against which" the Fourth Amendment is directed is a government agent's warrantless physical entry of a person's home, see Coffin v.

9

Brandau, 642 F.3d 999, 1009 (11th Cir. 2011) (en banc), but the Amendment's words "do[] not mean . . . that all searches and seizures require the issuance of a warrant," United States v. Goddard, 312 F.3d 1360, 1362 (11th Cir. 2002). The Amendment, for example, allows some warrantless protective sweeps of a defendant's home to ensure the safety of police officers and others. Maryland v. Buie, 494 U.S. 325, 336–37, 110 S.Ct. 1093, 1099–1100 (1990). "A protective sweep is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." Id. at 327, 110 S.Ct. at 1094 (quotation marks omitted). Under the Supreme Court's decision in Buie, a police officer may perform a protective sweep of a defendant's home when there are "articulable facts which, taken together with the rational inferences from those facts, . . . warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 334, 110 S.Ct. at 1098; see also Caraballo, 595 F.3d at 1224–25 (approving of a protective sweep that was not incident to an arrest).

B.

Noriega contends Corporal Williams violated the Fourth Amendment when he conducted a protective sweep of the Chutney Drive house and when he walked

around the property's outbuilding. According to Noriega, the district court should have suppressed all of the evidence seized at his Chutney Drive property under the exclusionary rule because Williams used what he had seen during his protective sweep of the house (the "same elaborate electrical system that [he had] observed" at the Jib Road property) and what he had smelled coming from the outbuilding (a strong odor of marijuana) to obtain the search warrant under which the evidence was seized.[2]

"The legality of the protective sweep is a difficult question. It requires balancing two deeply important interests—the lives of law enforcement officers and the constitutional right of the people to be secure in their homes under the Fourth Amendment." United States v. Delancy, 502 F.3d 1297, 1307 (11th Cir. 2007). We can, however, affirm a district court's denial of a motion to suppress on any ground supported by the record, Caraballo, 595 F.3d at 1222, so this case may not require us to decide the difficult question of whether Williams' protective sweep of Noriega's house complied with the Fourth Amendment.[3]

---

[2]Noriega contends for the first time in his reply brief that the evidence found at his property should be suppressed because the officers came onto his property without first obtaining a search warrant. That contention is forfeited because Noriega did not raise it in his opening brief. See United States v. Lopez, 649 F.3d 1222, 1246 (11th Cir. 2011).

[3]The government argues that the protective sweep's legality is not a difficult issue because Williams testified at the suppression hearing that Noriega, speaking through Sabina, consented to the protective sweep of his house. However, during the suppression hearing the

## C.

Even if the protective sweep was not permitted, it may be that the evidence in question was properly admitted anyway under the independent source exception to the exclusionary rule. Under that exception, evidence obtained from a lawful source that is independent of any Fourth Amendment violation is admissible, the rationale being that the exclusionary rule should not put the government in a worse position than if the constitutional violation had not occurred. See Murray, 487 U.S. at 538, 108 S.Ct. at 2533; see also Nix v. Williams, 467 U.S. 431, 443, 104 S.Ct. 2501, 2509 (1984) ("When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation.").

When a government agent makes an initial warrantless entry that arguably violates the Fourth Amendment and then relies in part on what he saw during that entry to obtain a search warrant, we apply a two-part test to determine whether evidence seized during the execution of the warrant was discovered independent of the initial entry and is therefore admissible regardless of whether that first entry violated the Fourth Amendment. See United States v. Chaves, 169 F.3d 687,

government conceded that it was "not in a position to prove [consent]," and we will not permit the government to undo its concession.

12

692–93 (11th Cir. 1999). The first thing we do is excise from the search warrant affidavit any information gained during the arguably illegal initial entry and determine whether the remaining information is enough to support a probable cause finding. See id. If the remaining or nonexcised information is enough to support a probable cause finding, the second thing we do is determine whether the officer's decision to seek the warrant was "prompted by" what he had seen during the arguably illegal entry. Murray, 487 U.S. at 542, 108 S.Ct. at 2536; see also Chaves, 169 F.3d at 693. To determine whether an officer's decision to seek a warrant is prompted by what he saw during the initial entry, courts ask whether the officer would have sought the warrant even if he had not entered. Murray, 487 U.S. at 542 n.3, 108 S.Ct. at 2536 n.3. If the officer would have done so, his decision to seek the search warrant is supported by an "independent source," and the evidence seized under the warrant is admissible regardless of whether the initial entry violated the Fourth Amendment. See Chaves, 169 F.3d at 692–93.

So, the first issue along this alternative route for deciding the case is whether, excluding any information gained by Corporal Williams' protective sweep of Noriega's house, there was still probable cause to support a search warrant for that house and the outbuilding. "A sufficient basis for probable cause for a search exists when under the totality of the circumstances there is a fair

13

probability that contraband or evidence of a crime will be found in a particular place. A fair probability, in turn exists when the facts and circumstances would lead a reasonably prudent person to believe that the place to be searched contains contraband or evidence of a crime." United States v. Lopez, 649 F.3d 1222, 1245 (11th Cir. 2011) (alteration, citations, and quotation marks omitted). And "[p]robable cause may be based on facts within the magistrate's knowledge and of which he has reasonable trustworthy information." United States v. Slay, 714 F.2d 1093, 1095 (11th Cir. 1983).

The only thing in Corporal Williams' affidavit about what he saw in Noriega's Chutney Drive house is his statement that there was "a bedroom that contained the same elaborate electrical system that [he had] observed in the grow rooms at [Jib Road]." Subtracting out that statement, the affidavit still recounted that: (1) Williams had received an anonymous tip that there were marijuana growing operations at the Chutney Drive property and two other locations; (2) he had already spoken with Judge Hardesty about the anonymous tip (and, other evidence shows, had informed the judge that the officers had found a marijuana growing operation inside the Jib Road house); and (3) Williams had "encountered a strong odor of fresh marijuana" as he walked around the Chutney Drive outbuilding.

Even without the statement about what Corporal Williams saw in the house during the protective sweep, the remaining information in the affidavit informed Judge Hardesty that: (1) an anonymous tip had indicated that the Chutney Drive property and two others were being used to grow marijuana; (2) the officers had found a marijuana growing operation inside the house at the Jib Road property, the first property mentioned in the anonymous tip; and (3) Williams had smelled a strong odor of marijuana coming from the outbuilding that was 50 to 75 yards behind the house on the Chutney Drive property. Those "facts and circumstances would lead a reasonably prudent person to believe that" the Chutney Drive house and outbuilding contained evidence of a crime. Lopez, 649 F.3d at 1245. Even excluding the information gained from Williams' protective sweep of Noriega's house, the affidavit still supplied probable cause to support the search warrant.

Noriega, however, contends that we should not consider in our independent source probable cause analysis the fact that Corporal Williams smelled a strong odor of marijuana coming from the outbuilding because, he argues, Williams violated the Fourth Amendment by walking around that outbuilding before obtaining a search warrant. If the outbuilding was within the curtilage of Noriega's house at Chutney Drive, it was "entitled to the same protection against unreasonable search and seizure as the [house] itself." United States v. Taylor,

15

458 F.3d 1201, 1206 (11th Cir. 2006).  If the outbuilding was located beyond the curtilage of Noriega's house, however, it was not entitled to that protection, and Williams did not need a search warrant to walk around it.  See United States v. Jones, — U.S. —, 132 S.Ct. 945, 953 (2012) (holding that a government agent's physical intrusion on an area beyond the home's curtilage "is of no Fourth Amendment significance"); Taylor, 458 F.3d at 1206.

A home's curtilage, "[t]he private property immediately adjacent to a home[,] is entitled to the same protection against unreasonable search and seizure as the home itself."  Taylor, 458 F.3d at 1206.  This area though is not unlimited, and "the extent of the curtilage is determined by factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself."  United States v. Dunn, 480 U.S. 294, 300, 107 S.Ct. 1134, 1139 (1987).  "The [Supreme] Court in Dunn identified four factors that assist us in resolving this question:  (1) the proximity of the area claimed to be curtilage to the home; (2) the nature of the uses to which the area is put; (3) whether the area is included within an enclosure surrounding the home; and[] (4) the steps the resident takes to protect the area from observation."  Taylor, 458 F.3d at 1206.

An analysis of those four factors leads us to the conclusion that the outbuilding was far enough out to be beyond the curtilage of Noriega's house.  "In

16

Dunn, the Supreme Court held that a barn, used for storing chemicals, located some sixty yards from the house was not located within its curtilage for Fourth Amendment purposes." Id. at 1207 (citing Dunn, 480 U.S. at 302, 107 S.Ct. at 1134). Here, as Noriega concedes—and undisputed testimony from the suppression hearing and the trial establishes—the outbuilding was located 50 to 75 yards away from the house. The substantial distance between the house and outbuilding supports the conclusion that it was not within the curtilage of the house. See Dunn, 480 U.S. at 302, 107 S.Ct. at 1140; see also Taylor, 458 F.3d at 1207.

The other three factors also support this conclusion. An area is more likely to be within the curtilage of a home if it is "used 'for intimate activities of the home.'" Taylor, 458 F.3d at 1207 (quoting Dunn, 480 U.S. 302–03, 107 S.Ct. at 1140). There is no indication that Noriega used the outbuilding for intimate activities; instead, it was used to grow marijuana. Criminal activity is not intimate activity, at least not in this instance. See id. Moreover, objective information that the outbuilding was not being used for intimate activities came in the form of: the anonymous tip that three properties, each with a house and outbuilding, were being used to grow marijuana; the partial corroboration of that tip at the Jib Road property by the discovery of the remnants of a marijuana growing operation inside

17

the outbuilding; and the presence at the Chutney Drive property of Sabina, the owner of one of the vehicles parked at the Jib Road property, and Huezo, who said that he lived at the Jib Road property. See Dunn, 480 U.S. at 302–03, 107 S.Ct. at 1140. Similarly, the fence that separated the outbuilding from the backyard also separated the outbuilding from the "clearly marked . . . area around the home." Id. at 302, 107 S.Ct. at 1140 (quotation marks omitted). And there is no evidence that Noriega took steps to protect the outbuilding from observation. See id. at 303, 107 S.Ct. at 1140; Taylor, 458 F.3d at 1208.

In light of these factors, Noriega did not have a reasonable expectation that the outbuilding should be treated like his house. The outbuilding was not within the "curtilage" of his house, and Corporal Williams did not violate the Fourth Amendment when he walked around the outbuilding before obtaining a search warrant. Therefore, the evidence that Williams smelled a strong odor of marijuana coming from the outbuilding should be considered in the independent source analysis.

The remaining question in that analysis is whether Corporal Williams' "decision to seek the warrant was prompted by what [he saw] during" the protective sweep. Murray, 487 U.S. at 542 & n.3, 108 S.Ct. at 2536 & n.3; see also Chaves, 169 F.3d at 693. Would he have sought the search warrant even if he

18

had not conducted the protective sweep?  That is a question of fact, see Murray, 487 U.S. 542–43, 108 S.Ct. at 2536, which the district court did not resolve when ruling on Noriega's motion to suppress.  Noriega urges us to find that Williams' protective sweep of the house prompted him to seek the warrant based on what he characterizes as the "temporal proximity of the 'sweep' and the request for the oral warrant."  Appellant Reply Br. 9.  "We, however, are not factfinders," Didie v. Howes, 988 F.2d 1097, 1104 (11th Cir. 1993), and "we will not substitute ourselves for the district court as [the] factfinder" in this case, United States v. Fulford, 662 F.3d 1174, 1181 (11th Cir. 2011).

Because it is the district court's role to find the facts, we will remand the case to that court for the limited purpose of allowing it to find whether Corporal Williams would have sought the oral search warrant for the Chutney Drive house and outbuilding if he had not already conducted the protective sweep of that house.  If Williams would have sought the warrant anyway, the district court did not err in denying the motion to suppress under the independent source exception to the exclusionary rule, and we can move on to Noriega's sufficiency of the evidence claim, which we do not reach at this time.  But if Williams would not have sought the warrant anyway, we will have to decide whether the district court erred in determining that the protective sweep of Noriega's house did not violate

19

the Fourth Amendment.  We leave it to the district court to determine whether to

hear any additional testimony from Williams or any other witness on the question.[4]

### III.

For the reasons we have discussed, we **REMAND** this case to the district

court for the limited purpose of having it make the factfinding or factfindings on

the question we have described.  After the district court has entered its findings,

the case should be returned to this Court, and the Clerk's Office will refer it to this

---

[4]Noriega makes two more arguments that the district court erred by not suppressing the evidence seized at his Chutney Drive property, but neither one is persuasive.  First, he argues that the district court should have suppressed the evidence seized pursuant to the oral search warrant for his property because that warrant violated the reasonableness requirement governing the issuance of an oral search warrant under Alabama Rule of Criminal Procedure 3.8.  That Alabama rule requires that, before a judge may issue an oral search warrant, circumstances must "make it reasonable to dispense . . . with a written affidavit."  Ala. R. Crim. P. 3.8(b)(1).  But it also provides that, "[a]bsent a finding of bad faith, evidence obtained pursuant to a warrant issued under this paragraph is not subject to a motion to suppress on the ground that the circumstances were not such as to make it reasonable to dispense with a written affidavit."  Ala. R. Crim. P. 3.8(b)(7).  Even if the circumstances did not make it reasonable to dispense with a written affidavit, the district court was not required to suppress the evidence on the ground that the state rule had been violated because federal law, not state law, governs the admissibility of evidence in federal court, and "complaints that the evidence was obtained in violation of state law are of no effect."  United States v. Glinton, 154 F.3d 1245, 1252 (11th Cir. 1998) (quotation marks omitted).  And even if state law governed the admissibility of evidence in federal court, the district court found that Williams did not act in bad faith in requesting the oral warrant, and we are not persuaded that finding was clearly erroneous.

Noriega also contends that Judge Hardesty did not make a verbatim record of the conversation he had with Corporal Williams after Williams requested the oral search warrant for Noriega's property, in violation of Ala. R. Crim. P. 3.8(b)(4).  As we have already mentioned, however, the district court was not required to suppress evidence due to a violation of a state law rule.  See Glinton, 154 F.3d at 1252.

panel which retains jurisdiction over the appeal.  <u>See</u> <u>Ballard v. C.I.R.</u>, 429 F.3d

1026, 1027 & n.1 (11th Cir. 2005).