[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-11886
Non-Argument Calendar
_____

D.C. Docket No. 2:15-cr-00415-RDP-SGC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GERAND EARL RATCLIFF,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(February 28, 2018)

Before TJOFLAT, NEWSOM and HULL, Circuit Judges.

PER CURIAM:

Defendant Gerand Earl Ratcliff appeals his convictions and sentences after pleading guilty to possession of cocaine with intent to distribute, possession of a firearm in furtherance of a drug trafficking crime, and possession of a firearm by a convicted felon. On appeal, Ratcliff argues that the district court erred in denying in part his motion to suppress evidence, statements, and other "fruits" obtained from three searches of his home and garage conducted by the police department of Pleasant Grove, Alabama. After careful review, we affirm.

## I.    BACKGROUND

### A.    Indictment and Motion to Suppress

On December 30, 2015, a federal grand jury indicted Ratcliff for one count of distributing 500 grams of more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) & (b)(1)(B) (Count 1), one count of possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A) (Count 2), and one count of possession of a firearm by a convicted felon, in violation of 18 U.S.C. § 922(g)(1) (Count 3). A superseding indictment, entered on April 1, 2016, replaced the original Count 1 with a charge of possessing with intent to distribute 500 grams or more of cocaine.

On February 2, 2016, defendant Ratcliff moved to suppress all evidence, statements, and other "fruits" that the government obtained from the three searches of Ratcliff's house and garage. On March 14, 2016 and April 7, 2016, the district

2

court held an evidentiary hearing on the motion to suppress.  Six Pleasant Grove police officers testified at the hearing: Officer Kendal Coker, Corporal Duane Martin, Officer Samuel Powell, Detective Andy Reed, Lieutenant Daniel Reid, and Chief Robert J. Knight.  Ratcliff did not testify.

The facts presented herein were established at the evidentiary hearing.  The three searches at issue in this appeal are: (1) the officers' initial search of Ratcliff's house; (2) the second search, conducted after Ratcliff consented; and (3) the third search, authorized by a search warrant.

## B.     Arrival and Initial Search

On November 3, 2015, at approximately 5:30 in the afternoon, three Pleasant Grove police officers, Corporal Duane Martin, Officer Kendal Coker, and Officer Samuel Powell, arrived in separate cars at 413 Fourth Terrace, Pleasant Grove, Alabama, to investigate an OnStar[1] "ping[]" about a vehicle that was stolen in Mississippi and located at that Alabama address.  Upon arrival, the officers saw two cars parked outside, neither of which matched the description of the stolen vehicle.  Corporal Martin looked through a window in the garage door, and saw a car in the garage matching the description of the stolen vehicle, a cream-colored Cadillac Escalade.

---

[1]OnStar Corporation, a subsidiary of General Motors, provides subscription-based navigation, security, and other services to car owners using cellular and GPS technology.

Officer Coker approached the garage, but she was not tall enough to see through the garage windows. Officer Coker stood on top of a "ledge" or "wall," used a flashlight, and saw a cream-colored Cadillac Escalade, which matched the description of the stolen vehicle.

Corporal Martin then went to the front door of the house. He knocked on the front door and announced that police were present. Corporal Martin heard footsteps walking toward the door, followed by an "unintelligible voice" on the other side of the door, "like someone saying something." He then heard footsteps "leaving the doorway area . . . like someone running through the residence."

Officer Powell moved to the left side of the house, where he could see through a window into the kitchen and living room. When Corporal Martin knocked on the door, Officer Powell heard "loud steps like someone running through the house," and saw a "blur go by" through the window. He also heard voices inside the house, but could not tell how many voices there were.

Officer Coker remained by the garage door. She, as well, heard "running, footsteps" and "talking going on" inside the house.

Corporal Martin continued announcing that police were present until defendant Ratcliff opened the door "a short while later." When Ratcliff opened the door, both Corporal Martin and Officer Coker smelled the odor of marijuana "very strongly." Corporal Martin immediately "put [Ratcliff] to the ground." Corporal

4

Martin asked Ratcliff about the smell, and Ratcliff replied that there was a "dime bag" of marijuana in the kitchen.

After Corporal Martin detained defendant Ratcliff, he and Officer Coker placed Ratcliff in handcuffs at the front door. Corporal Martin and Officer Powell then checked the house for "anybody that was in the residence, just to get them out." Corporal Martin later explained the officers' reasons for conducting the initial check-search as follows: "Seeing the description fitting the stolen vehicle was one [reason], the running through the residence after I announced myself, and then along with the strong odor of marijuana."

During their initial check-search, Corporal Martin and Officer Powell saw in plain sight a handgun and an unlabeled transparent pill bottle containing a baggie with pills in the master bedroom, and raw marijuana in the master bathroom toilet. The initial check-search concluded in the basement garage, where Corporal Martin and Officer Powell found the Cadillac Escalade that the officers had seen through the garage window. Corporal Martin estimated that the check-search lasted "[a] couple minutes, maybe." They did not find any other people in the house or garage.

Officer Coker stayed with defendant Ratcliff at the front door. At one point, Ratcliff asked Officer Coker why the officers were at his house, but otherwise did not say anything to Officer Coker while the initial search was going on.

When they had completed their initial search, Corporal Martin and Officer Powell returned to the front door, where Officer Coker and Ratcliff were. Every officer's weapon was holstered by the time the initial search concluded. The officers made Ratcliff more comfortable by sitting him upright. The officers spoke respectfully to Ratcliff, and Ratcliff was cooperative. Nevertheless, Ratcliff was not free to leave. Corporal Martin and Officer Powell then returned to the garage, where they contacted OnStar, had OnStar activate the Escalade's car alarm, and confirmed that it was the stolen car.

## C.    Consent Search

After the officers completed the initial search and verified that the car in the garage was the stolen Cadillac, they called Detective Andy Reed, a narcotics detective, to the scene. Detective Reed arrived in approximately 10 minutes. When Detective Reed arrived, the officers brought Ratcliff inside the house and seated him on the couch, where Detective Reed spoke with him. Ratcliff was handcuffed during this conversation, but appeared to be comfortable. Both he and Detective Reed were calm, did not raise their voices, and, in Detective Reed's words, were "[v]ery nice, very casual, you know, friendly."

Detective Reed explained to Ratcliff that he was a narcotics detective and that he was called to the house because of the apparent odor of marijuana. Ratcliff told Detective Reed that he flushed "about an ounce" of marijuana down the toilet

6

when the officers arrived.  Detective Reed told defendant Ratcliff: "[E]ither you can give me permission to search your residence because I'm here because of the way your house smells, or I can go find a judge, get a search warrant, and then I'll come back and then we will do that."  Ratcliff said he would consent to the search.

Detective Reed went to his truck to retrieve a "prewritten" consent form, but was unable to find one.  Instead, Detective Reed hand wrote a consent to search on a notepad and explained to Ratcliff what he was writing.  Detective Reed read the consent aloud to Ratcliff, and then gave the consent to Ratcliff to read to himself. The consent provided as follows:

> I Gerand Ratcliff give the Pleasant Grove Police Dept. and members of the United Narcotics Investigative Task Force "U.N.I.T." permission under my own free will to search my residence – 413 4th Terr., Pleasant Grove AL 35127 – for any illegal narcotics, paraphernalia, documents with information containing the [sale] or purchase of illegal narcotics; including computers, safes, ledgers, money, firearms, etc.

Ratcliff signed the consent.

Detective Reed proceeded with the consent search.  Rather than "full-on searching," Detective Reed "was just kind of walking around, looking."  Detective Reed saw the pill bottle in the master bedroom and the marijuana floating in the master bathroom toilet, which Corporal Martin and Officer Powell saw during the initial search.  He also saw a large safe in the master bedroom and a smaller safe in the second bedroom.

7

Detective Reed returned to Ratcliff, and asked Ratcliff about the safes. Detective Reed did not inform Ratcliff of his Miranda[2] rights prior to this conversation. Ratcliff said the safes did not contain marijuana or guns, but contained approximately $100,000. Ratcliff offered to give Detective Reed half of the money if Detective Reed would let him go. Detective Reed brought Ratcliff to the smaller safe and had him open it. The safe contained "a stack [of] money." Detective Reed then had Ratcliff open the larger safe, which contained "lots of money." Ratcliff repeated his offer to give Detective Reed half of the money.

At that point, Detective Reed determined that the officers should obtain a search warrant before searching further. Detective Reed and the other officers convened in the hallway, where Detective Reed explained that no further searching should take place until they had the warrant. Detective Reed said to Corporal Martin: "We've got a little bit of marijuana floating in the toilet. We've got the pill bottle with the couple pills sitting on the nightstand. We've got all this money and he is offering me half. At this point, I would feel better . . . going ahead and getting a search warrant."

Ratcliff was transported to the police station. Detective Reed called his partner to request that additional officers be sent to the house, to "have extra hands as far as drug cops go." Shortly thereafter, Lieutenant Daniel Reid and Chief

---

[2]Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966).

8

Robert J. Knight arrived. Once the house was secured, Detective Reed left to obtain the search warrant.

## D.    Warrant Application and Search

Detective Reed prepared two search warrant affidavits, one based on the pill bottle and the other based on the marijuana floating in the toilet. The judge signed the warrant based upon the pill bottle. That search warrant provided, in relevant part, as follows:

4) On November 3rd, 2015, officers with the Pleasant Grove Police Department received a call from OnStar (General Motors) stating that a stolen vehicle was located via GPS at 413 4th Terrace, Pleasant Grove, AL 35127. Upon arriving, officers visually observed and heard (by alarm activation) the described stolen vehicle parked inside the garage of 413 4th Terrace. Officers then knocked on the door and observed an unknown black male run towards the rear of the residence. After repeatedly announcing their presence, officers stated the black male opened the front door. At that point an overwhelming odor of marihuana came from inside the residence. The black male was then identified as Gerald Earl Ratcliff via his Alabama driver's license. Mr. Ratcliff then spontaneously stated to officers that he had a "dime bag" of marihuana in the kitchen.

5) On November 3rd, 2015, at approximately 1900hrs I Detective Reed was contacted by responding officers in regards to the above mentioned narcotics investigation. Upon arrival I spoke with a man identified as Gerald Earl Ratcliff. Mr. Ratcliff spontaneously stated to me, that he had flushed an ounce of marijuana down the toilet once he saw the officers. Responding officers relayed to me that

9

Ratcliff stated to them there was more narcotics in the residence.

6) On November 3rd, 2015, I spoke with Gerald Ratcliff about [there] possibly being more narcotics in the residence. I asked Mr. Ratcliff if he would sign a consent to search his residence. At 1905hrs Ratcliff signed consent to search his residence giving myself and other officers permission to search. As I went into the residence and walked into what was identified as Ratcliff's bedroom, I located a pill bottle without a label sitting on the right side night stand. Inside the pill bottle was a plastic baggie that had Norco (Hydrocodone 10mg). I also located inside the bedroom several baggies with white resid[ue] and several digital scales commonly used in weighing narcotics. I also observed marihuana inside the toilet where Ratcliff stated he flushed it. Officers immediately backed out of the residence to apply for a search warrant.

After obtaining the warrant, Detective Reed returned to Ratcliff's house, and the officers executed the warrant. The search lasted almost three hours, from 10:30 p.m. on November 3, 2015 until 1:15 a.m. on the morning of November 4, 2015. During the search, officers found six digital scales with white powder residue, multiple plastic baggies with white powder residue, two loaded handguns, a loaded shotgun, multiple loaded ammunition magazines, approximately $247,460 in cash, and approximately 1.8 kilograms of cocaine.

Later on the morning of November 4, 2015, Detective Reed and his partner interviewed Ratcliff while he was in custody at the jail. Before that interview,

Ratcliff was informed of his Miranda rights.  In the interview, Ratcliff admitted that he was unemployed, and that he sold cocaine "to make ends meet."

## E.    District Court Order

After the evidentiary hearing, the district court issued a written order granting in part and denying in part Ratcliff's motion to suppress.  The district court suppressed Ratcliff's initial statements that (1) he had a dime bag of marijuana in the kitchen, (2) he flushed an ounce of marijuana down the toilet, and (3) the safes contained approximately $100,000.  The district court concluded that those statements were elicited by custodial questioning before Ratcliff was informed of his Miranda rights.

In all other respects, the district court denied the motion to suppress.  The district court concluded that the physical evidence recovered during the three searches, as well as defendant Ratcliff's statement offering half the money in the safes to Detective Reed, were not obtained in violation of the Fourth Amendment.

In reaching this conclusion, the district court first determined that Corporal Martin, Officer Coker, and Officer Powell were justified in knocking on the front door of Ratcliff's house and seeking to speak to Ratcliff.  The district court noted that the officers were notified that a stolen vehicle may be located at the address.  The district court further found that defendant Ratcliff voluntarily opened his door in response to Corporal Martin's knock and announce.  The district court reasoned

11

that even if Corporal Martin and Officer Coker impermissibly looked through the garage door beforehand, the "knock and talk . . . would have occurred regardless of the preceding action."

The district court then concluded that, once Ratcliff opened the door, the officers had probable cause to arrest him, "because of his suspicious behavior and the reeking marijuana smell they encountered when the door opened." The district court found that because the officers were unsure how many other people were in the house, the officers were permitted to conduct a search incident to the arrest. The search was permissible both as a protective sweep to ensure the officers' safety, and due to the exigent need to prevent the possible destruction of drug evidence.

Next, the district court found that Ratcliff voluntarily consented to the subsequent search of his house by Detective Reed. The district court reasoned that when Ratcliff consented to the search, he was seated comfortably on the couch, the officers were speaking to him in a friendly tone, and the officers' weapons were holstered. The district court also noted that Ratcliff gave both verbal and written consent. The district court acknowledged that Ratcliff may have been "under some pressure" to consent, but found that this did not cause the consent to become involuntary.

12

As to the search warrant, the district court concluded that it was validly supported, because "there was enough untainted evidence included in the affidavit (the knock and announce, the suspicious behavior in the house, the reeking smell of marijuana, the consent search, and Detective Reed's discoveries during that consent search) to justify a warrant."

## F.   Guilty Plea and Sentencing

Two weeks after the district court denied his motion to suppress, Ratcliff entered a conditional guilty plea to all three counts of the superseding indictment. On April 13, 2017, the district court sentenced Ratcliff to (1) 60 months' imprisonment as to Counts 1 and 3, to be served concurrently, and (2) 60 months' imprisonment as to Count 2, to be served consecutively to Counts 1 and 3, for a total sentence of 120 months' imprisonment.

Ratcliff now appeals from the denial of his motion to suppress.[3]

## II.   STANDARD OF REVIEW

We apply a mixed standard of review to the denial of a motion to suppress. United States v. McCullough, 851 F.3d 1194, 1199 (11th Cir.), cert. denied, 137 S. Ct. 2173 (2017). We review a district court's factual findings for clear error. Id. A factual finding is clearly erroneous only if we are "left with the definite and firm conviction that a mistake has been committed." United States v. Mullens, 65 F.3d

---

[3]Ratcliff does not raise any issues regarding his sentences on appeal.

13

1560, 1563 (11th Cir. 1995) (quotation omitted).  In addition, we defer to a district court's credibility determination "unless it is contrary to the laws of nature, or is so inconsistent or improbable on its face that no reasonable factfinder could accept it."  United States v. Holt, 777 F.3d 1234, 1255 (11th Cir. 2015) (quotation omitted).  However, we review legal determinations, including questions of probable cause and reasonable suspicion, de novo.  Ornelas v. United States, 517 U.S. 690, 699, 116 S. Ct. 1657, 1663 (1996); McCullough, 851 F.3d at 1199.

### III. FOURTH AMENDMENT

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV.  A warrantless search of a home is "presumptively unreasonable."  United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir. 1991) (en banc) (quoting Payton v. New York, 445 U.S. 573, 586, 100 S. Ct. 1371, 1380 (1980)).  Nevertheless, a warrantless search of a home may be allowed under certain circumstances.

Police may conduct a warrantless search of a dwelling when both probable cause and exigent circumstances exist.  Id.  Probable cause exists when, under the totality of the circumstances, there is a "fair probability that contraband or evidence of a crime will be found in a particular place."  Id. (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S. Ct. 2317, 2332 (1983)).  Exigent circumstances

14

may arise "when there is danger that the evidence will be destroyed or removed." Id. In determining whether exigent circumstances existed, the appropriate inquiry is whether the facts "would lead a reasonable, experienced agent to believe that evidence might be destroyed before a warrant could be secured." Id. (quotations omitted).

In addition, police may conduct a warrantless "protective sweep" of a home in conjunction with an in-home arrest if the officers have "a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 1513 (quoting Maryland v. Buie, 494 U.S. 325, 337, 110 S. Ct. 1093, 1099-1100 (1990)). The presence of multiple vehicles at a house, combined with suspicious behavior, can give rise to a reasonable belief that someone else may be hiding in the house. Id.

The Fourth Amendment is not implicated by a "knock and talk" that is unconnected with a search. United States v. Taylor, 458 F.3d 1201, 1204 (11th Cir. 2006). For legitimate police purposes, police officers may enter onto private land, knock on the door of a residence, and seek to speak with the inhabitants, just as any private citizen may. See Florida v. Jardines, 569 U.S. 1, 8, 133 S. Ct. 1409, 1415-16 (2013); Taylor, 458 F.3d at 1204. Officers need only reasonable suspicion, not probable cause, to justify a knock and talk. Tobin, 923 F.2d at 1511.

15

## IV. INITIAL SEARCH

Here, as an initial matter, the district court did not err in concluding that the three officers who arrived at defendant Ratcliff's house—Corporal Martin, Officer Coker, and Officer Powell—had reasonable suspicion to justify a knock and talk. The officers were told that OnStar had located a vehicle stolen in Mississippi at that specific Alabama address. Therefore, it was, as the district court stated, "both reasonable and permissible" for the officers to seek to question the inhabitants of the house. Although Corporal Martin's and Officer Coker's peering into the garage may have gone beyond the scope of a knock and talk at a front door, the district court found that the officers would have knocked on Ratcliff's door "regardless of the preceding action." Given that the officers were responding to the OnStar notification about a specific vehicle at a specific address, we do not have a "definite and firm conviction" that the district court's finding was a mistake. See Mullens, 65 F.3d at 1563. Accordingly, we agree with the district court that the knock and talk was permissible. Tobin, 923 F.2d at 1511; Taylor, 458 F.3d at 1204.

We also agree with the district court that the initial search incident to Ratcliff's arrest was constitutional due to the exigent circumstance of preventing

16

the destruction of evidence and as a protective sweep to ensure the officers'

safety.[4]  Tobin, 923 F.2d at 1510, 1513.

When the officers arrived at Ratcliff's house, they saw two cars in the

carport.  After Corporal Martin knocked for the first time on the front door, all

three officers heard voices and footsteps moving quickly through the house.  In

light of these facts, it was reasonable for the officers to suspect that multiple people

might be in the house.  See id. at 1513.

When Ratcliff opened the door, both Corporal Martin and Officer Coker

smelled the odor of marijuana "very strongly."  The smell of marijuana alerted the

officers that "contraband or evidence of a crime"—specifically, illegal drugs—

might be present in the house.  Id. at 1510.  And because other people might have

been in the house and drugs can be destroyed easily, "a reasonable, experienced

agent" could believe that "evidence might be destroyed before a warrant could be

secured."  Id.

Therefore, once Ratcliff was arrested, both probable cause and exigent

circumstances existed to justify an immediate search in order to prevent the

destruction of evidence.  Id. at 1510-11.  Indeed, the initial search revealed that

Ratcliff did, in fact, attempt to dispose of some marijuana in the toilet.  In addition,

any other potential occupants of the house might have "pos[ed] a danger to those

---

[4]Ratcliff does not challenge the constitutionality of his arrest on appeal.

17

on the arrest scene." Id. at 1513.  Therefore the officers also were justified in performing a "protective sweep" to ensure their safety.  Id.

Accordingly, district court did not err in denying the motion to suppress evidence of the handgun, the bottle of pills, and the marijuana in the toilet that the officers saw in plain view during the initial search.  See United States v. Williams, 871 F.3d 1197, 1201-02 (11th Cir. 2017).

## V. CONSENT SEARCH

Police may conduct a warrantless search of a home if they obtain voluntary consent to do so.  United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).  In order for consent to be voluntary, "it must be the product of an essentially free and unconstrained choice."  Id.  In determining whether consent was given voluntarily, a court should consider "all the surrounding circumstances," taking into account "subtly coercive police questions, as well as the possibly vulnerable subjective state of the person who consents."  Id. (quotations omitted).  Courts must "strike a balance between [the individual's] right to be free from coercive conduct and the legitimate need of the government to conduct lawful searches."  Id.  Pressure on an individual to give consent does not necessarily mean that his consent is involuntary, particularly when the police officers do not "employ[] any tactics that would augment the degree of coercion that is inherent in any arrest."  Id. at 362.

18

When a district court finds that consent was voluntarily given, we give "a great deal of deference" to that finding. Id. at 359. We will disturb such a finding "only if we are left with the definite and firm conviction that the trial judge erred." Id.

Here, the officers did not employ any tactics to add to the coercion inherent in any arrest. Id. at 362. To the contrary, the officers made Ratcliff comfortable, spoke to him respectfully, and proceeded calmly. There were several officers in the vicinity, but their weapons were holstered. Ratcliff was told that he could withhold consent. And Detective Reed gave Ratcliff time to review and sign the handwritten consent form. We have nothing near a "definite and firm conviction that the trial judge erred" in finding that Ratcliff's consent was voluntary. Id. at 359. Accordingly, the district court did not err in denying the motion to suppress evidence of the money in the two safes that Detective Reed found during the consent search.[5]

---

[5]We note the district court's additional conclusion that Ratcliff's consent was not tainted by any prior illegal police activity, assuming arguendo that any such illegal activity took place, because (1) enough time passed between the officers' initial search and Ratcliff's consent, (2) Ratcliff's review of the consent form after the officers conducted the initial search was an intervening circumstance, and (3) the officers' conduct during the initial search was, in any event, not a flagrant disregard of the law. Because we conclude that the officers' initial protective search in the house did not violate the Fourth Amendment at all, we need not address this conclusion of the district court.

## VI. SEARCH WARRANT

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The existence of probable cause is a question of law that we review de novo. United States v. Gamory, 635 F.3d 480, 490 (11th Cir. 2011).

If a search authorized by warrant followed a warrantless search that arguably violated the Fourth Amendment, we apply a two-part test to determine whether evidence seized pursuant to the warrant is still admissible. United States v. Noriega, 676 F.3d 1252, 1260 (11th Cir. 2012). First, we "excise from the search warrant affidavit any information gained during the arguably illegal initial entry and determine whether the remaining information is enough to support a probable cause finding." Id. If the remaining information in the affidavit is enough to support probable cause, we ask whether the officer's decision to seek the warrant was prompted by what he saw during the arguably illegal search. Id. If the officer would have sought the warrant even without the evidence or information gained from the illegal search, then the warrant is supported by an independent source, and any evidence seized pursuant to the warrant is admissible. Id. at 1260-61.

Here, applying the first part of the Noriega test, there was sufficient evidence from untainted sources to support probable cause for the search warrant.

20

The officers' knock and talk, initial protective search, and consent search were all permissible under the Fourth Amendment.  Evidence that is visible in plain view during a permissible warrantless search may be seized and used as a basis for a search warrant.  Williams, 871 F.3d at 1202.  The evidence obtained from these permissible searches and cited in Detective Reed's warrant affidavit included the following: (1) a person running to the back of the house when Corporal Martin knocked on the door; (2) the strong smell of marijuana when defendant Ratcliff opened the door; (3) the bottle of pills in the bedroom; and (4) the marijuana in the toilet.  This evidence alone was sufficient to support probable cause for the search warrant.  Noriega, 676 F.3d at 1260.

Turning to the second part of the Noriega test, Detective Reed testified that he decided to obtain a search warrant based upon the pills, the marijuana in the toilet, and the money in the safes, all of which Detective Reed discovered during his permissible consent search.  Detective Reed's decision to obtain a warrant was therefore not "prompted by" evidence or information that he obtained illegally.  Id. at 1260-61.

Accordingly, the search warrant was properly supported by probable cause independent of any improperly obtained evidence.  Id.  The district court did not err in denying the motion to suppress the firearms, cocaine, digital scales, and money that was obtained from the search warrant.  Id.

21

## IV.  CONCLUSION

Based on the foregoing reasons, we conclude that the district court did not err in denying in part defendant Ratcliff's motion to suppress.  We therefore affirm Ratcliff's convictions and sentences.

**AFFIRMED.**